735 P.2d 451

The **ARIZONA PROPERTY AND CASUALTY INSURANCE GUARANTY FUND**, a subdivision of the Department of Insurance of the State of Arizona, Plaintiff-Appellant,

v.

**William B. HELME, M.D.** and Jane Doe Helme, husband and wife; Neurological Surgeons, P.C., an Arizona corporation; Glenda Worsham, surviving spouse of Linward A. Worsham, and Chanita Lin Engelke and Choya Lynn Worsham, surviving children of Linward A. Worsham, Defendants-Appellees.

No. CV–86–0368–PR.

Supreme Court of Arizona, En Banc.

March 26, 1987.

Reconsideration Denied May 5, 1987.

Holloway & Thomas, P.C. by Benjamin C. Thomas, Grant H. Goodman, Phoenix, for plaintiff-appellant.

Leonard & Clancy, P.C. by Kenneth P. Clancy, Phoenix, for defendants-appellees.

FELDMAN, Vice Chief Justice.

Arizona Property and Casualty Insurance Guaranty Fund (Fund) brought a declaratory judgment action to limit its obligation to pay claims against doctors whose professional liability insurance carrier became insolvent. The court of appeals reversed the trial court's grant of summary judgment in favor of the doctors, limiting the Fund's liability to the one claim it had already paid. *Arizona Property & Casualty Insurance Guaranty Fund v. Helme*, 153 Ariz. 123, 735 P.2d 445 (Ct.App. 1986). Defendants have asked us to review that opinion pursuant to Rule 23, Ariz.R. Civ.App.P., 17A A.R.S. (Supp.1986). Because the issue is a matter of first impression, we granted the petition to correct an error of law regarding the Fund's obligations.

We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24.

## FACTS

The trial court granted summary judgment in favor of defendants. Therefore, we view the record in the light most favorable to the Fund. *Farmers Insurance Co. v. Vagnozzi*, 138 Ariz. 443, 448, 675 P.2d 703, 708 (1983).

Linward A. Worsham became paralyzed and eventually died following an April 29, 1975 automobile accident. Alleging medical malpractice, his wife and children (survivors) brought a wrongful death action against numerous doctors and medical personnel. The complaint did not specify the acts of alleged negligence, but during discovery it became clear that the predominant theory of recovery was based on the failure of those treating Worsham to either

examine his spinal x-rays or react to his worsening condition. According to survivors, the x-rays showed a fracture dislocation of Worsham's cervical vertebra, a condition which, unrecognized, was left untreated and allegedly caused Worsham's subsequent quadriplegia and resulting death.

Dr. John A. Eisenbeiss and Neurological Surgeons, P.C. (NSPC), the professional corporation of which Eisenbeiss was a shareholder and employee, were among the named defendants. Survivors' complaint alleged that the negligence of Eisenbeiss *and* other unspecified NSPC employees contributed to Worsham's death.

NSPC and its shareholders had purchased professional liability insurance coverage with Imperial Insurance Company of California (Imperial). Under the Imperial policies, NSPC and *each* of NSPC's employed doctors were insured for up to $3 million coverage *per* "occurrence." Imperial, however, became insolvent in May 1975 and was unable to honor the claims. As a consequence, the Fund, created by the state of Arizona in 1970 to pay claims of insolvent insurers, assumed Imperial's claim obligations. *See* A.R.S. §§ 20–661 *et seq.* The Fund, however, may pay no more than $99,900 on each "covered claim." A.R.S. § 20–664(A)(1).[1] A "covered claim" is "an unpaid claim ... which arises out of and is within the coverage of an insurance policy" issued by an insolvent insurer. A.R.S. § 20–661(3).

When the Fund becomes involved, it assumes all the "rights, duties and obligations" of the insolvent insurer. A.R.S. § 20–664(A)(2).[2] Accordingly, when the Fund received notice of survivors' lawsuit, it retained counsel to defend Eisenbeiss and NSPC, thus fulfilling its obligation under the policy provision which required Imperial to defend any suit against the insured. Discovery ensued. During February 1980, survivors offered to discharge

Eisenbeiss, NSPC, and any other NSPC shareholders for $99,900, the Fund's per claim liability limit. The Fund declined this settlement offer.

As discovery continued, survivors learned that Dr. William B. Helme, another NSPC employee and shareholder, might also have been negligent in failing to examine Worsham's x-rays.[3] Survivors' attorneys believed that their failure to name Helme as a defendant presented no obstacle to recovery because they believed that survivors could recover from NSPC for Helme's negligence under respondeat superior principles.

Shortly before trial, survivors' attorneys notified the Fund that they now were seeking to recover $199,800 for separate claims based on the separate acts of negligence of the two doctors, Eisenbeiss and Helme. The Fund took the position that its liability was limited to $99,900 because (1) neither Helme *nor* NSPC could be liable for Helme's negligence as he was not a named defendant and the statute of limitations had run against him, and, (2) even if NSPC could be held liable for Helme's negligence, there had been only one "occurrence" under the Imperial policy and, therefore, survivors could recover for only one "covered claim" under A.R.S. § 20–664(A)(1).

In a March 18, 1981 letter, survivors' attorneys told the Fund that they were willing to settle the suit against Eisenbeiss, Helme, and NSPC for $137,500. The letter also mentioned that the doctors had retained private counsel and were discussing settlement possibilities with survivors. The letter continued:

> [The doctors] are concerned about personal exposure for sums in excess of the $100,000 coverage you [the Fund] claim[s] to have. They believe, and we believe, that there is $200,000 in coverage. There is some discussion (preliminary only) that a stipulated judgment be

---

1. Renumbered A.R.S. § 20–667(B) (Supp.1986). We use the former statutory designations throughout this opinion.

2. Renumbered A.R.S. § 20–667(C) (Supp.1986).

3. The parties argue over when survivors learned of Helme's negligence and when they first notified the Fund. We do not believe the timing material to the legal issues involved in this appeal.

entered in the amount of $350,000 in exchange for a release of any personal liability of Dr. Eisenbeiss or his group. Once the Fund declined this settlement offer, Eisenbeiss, Helme, and NSPC, on the advice of their personal attorney, entered into a settlement agreement with survivors. The doctors and the corporation allowed survivors to obtain a judgment against them and NSPC for $350,000 in exchange for the survivors' covenant not to execute against the doctors or NSPC. This type of agreement is commonly referred to as a "Damron"[4] agreement. In addition, each doctor made certain stipulations as to his own negligence, the number of individual negligent acts, and the number of separate occurrences under the Imperial policy.

The Fund had declined an invitation to participate in the settlement negotiations. In an affidavit, Robert H. Renaud, the attorney hired by the Fund to defend Eisenbeiss and NSPC, said that he was aware of the settlement discussions, but did not desire to attend or to participate.

The Fund then paid $99,900 for the Eisenbeiss claim and filed this action requesting a declaration that its liability does not exceed that amount. The Fund named Helme, NSPC, and survivors as defendants.[5] In its partial summary judgment motion, the Fund reiterated the single claim argument and also contended that it has no obligation to pay any amount exceeding $99,900 because Helme and NSPC breached their express contractual duty to cooperate by making the Damron agreement. The parties raised other issues in the trial court, but did not address them in their motions for summary judgment.

Without explanation, the trial court granted survivors' cross-motions for summary judgment on all counts. The court of appeals reversed. The court agreed with survivors that under established respondeat superior principles NSPC could be held liable for Helme's negligence, even if

Helme was not named as a party. 153 Ariz. at 126–27, 735 P.2d at 448–49. However, the court determined that the negligence of Eisenbeiss and Helme was a "series of related omissions" that constituted only one "occurrence" under the Imperial policy. *Id.* at 127–28, 735 P.2d at 449–50. Although this holding meant that the Fund was liable for $99,900 only, two members of the court of appeals' panel also held that the Fund was not obligated to pay the second claim because Helme and NSPC had breached their duty to cooperate. *Id.* at 127–28, 735 P.2d at 449–50.

Neither side has requested review of the court of appeals' holding that survivors can recover from NSPC for Helme's negligence even though Helme was not a named defendant. We therefore accept that holding as the law of the case[6] and address only the following issues:

1. Were the negligent omissions of Eisenbeiss and Helme one "occurrence" under the Imperial policy, thus constituting only one "covered claim" pursuant to A.R.S. §§ 20–664(A)(1) and 20–661(3)?

2. Did Helme and NSPC breach the contractual duty of cooperation by entering into the settlement agreement with survivors?

## DISCUSSION

### A. *Number of "Covered Claims"*

The Fund is liable for a maximum of $99,900 per "covered claim." A.R.S. § 20–664(A)(1). A "covered claim" is a claim that would have been covered by the insolvent insurer's policy. A.R.S. § 20–661(3). Neither the statutes nor the insurance policy defines "claim," but the parties agree that it means a third party's assertion of a legal right against an insured. As the parties and court of appeals recognized, the

---

4. *See post* 153 Ariz. at 137–38, 735 P.2d at 459–60.

5. Only survivors have been represented in this action.

6. NSPC was named as a party in the original complaint. The complaint sought damages for

Eisenbeiss's act and for the negligence of other NSPC employees. Thus, NSPC is vicariously liable for the negligent acts of both Eisenbeiss and Helme.

issue becomes a matter of interpreting the indemnity provisions of the Imperial policy.

Imperial contracted to indemnify its insureds separately up to the limit per occurrence for "each occurrence" in which an insured became legally obligated to pay damages because of professional negligence. Under A.R.S. § 20–664(A)(1), that limit became $99,900 per occurrence. The policy defines "occurrence" as "any incident, act or omission, *or series of related incidents, acts or omissions* resulting in injury...." (emphasis added). The court of appeals held that the Fund is liable for only one covered claim (occurrence) because the failure of Eisenbeiss and Helme to look at Worsham's x-rays constituted a "series of related ... omissions." This is so, according to the court of appeals, because the wrongful death complaint "asserted only one type of negligent conduct as it pertained to the continuous and ongoing patient care performed by various parties." 153 Ariz. at 127, 735 P.2d at 449. In addition, the court found that the omissions of the two doctors were "intimately related" and "identical." *Id.* at 127, 735 P.2d at 449. The number of doctors involved is irrelevant, according to the court. *Id.* at 127, 735 P.2d at 449.

We disagree with the court of appeals' analysis. First, the statement that the complaint "asserted only one type of negligent conduct," 153 Ariz. at 127, 735 P.2d at 449, is incorrect. The complaint did not specify those acts upon which it was based, and information developed during discovery supported various potential theories of recovery. More importantly, we disagree with the court of appeals' conclusion that the definition of "occurrence" is "clear and unambiguous." 153 Ariz. at 127, 735 P.2d at 449.

■ Ordinarily, if an insurance policy uses "occurrence" without defining the term, the courts inquire whether " 'there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damages.' " *See American Indemnity Co. v. McQuaig,* 435 So.2d 414 (Fla.App.1983); Annot., 55 A.L.R.2d 1300 (1957 and Supp.1978); 8A J. APPLE-MAN, INSURANCE LAW AND PRACTICE § 4891.25, at 16–19 (1981) (if a cause is interrupted or replaced by another cause, the chain of causation is broken and more than one occurrence has taken place). The Imperial policy definition of "occurrence" employs this causal test (acts or omissions "resulting in injury") but modifies it by using the phrase "series of related" acts or omissions. Under the Imperial policy, a "series of related" causes of an injury merge to constitute only one "occurrence."

Therefore, the question we must address is whether the failures of the two doctors should be treated as one "occurrence" because they constituted a "series of related incidents, acts or omissions" which resulted in the patient's death. Neither the Imperial policy, the parties, nor the court of appeals have defined the word "related" and our research does not reveal any generally accepted legal meaning; therefore, we will assume that the policy uses "related" in its commonly accepted dictionary sense. Webster's dictionary defines the intransitive verb "relate" as "show[ing] or establish[ing] a logical or causal connection between." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED, at 1916 (1965). A "related" act or omission, therefore, is one that has a logical *or* causal connection with another act or omission.

■ We do not believe that the word "related" as used in the policy can be equated with the phrase "logical connection." Logic, like beauty, is in the eye of the beholder and greatly depends upon the subjective mental process of the reviewer. Incidents may be "logically related" for a wide variety of indefinable reasons. Causal connection depends, to a much greater extent, on objective facts in the record. If we were compelled to equate "related" with "logically connected," we would be compelled to find the policy provision ambiguous, and for that reason to find in favor of the claimant. *Parks v. American Casualty Co.,* 117 Ariz. 339, 341, 572 P.2d 801, 803 (1977). We have attempted to abandon this approach. *See Transamerica Insurance Group v. Meere,* 143 Ariz. 351,

355, 694 P.2d 181, 185 (1984). We prefer, instead, to determine the meaning of a clause which is subject to different interpretations or constructions by examining the purpose of the clause, public policy considerations, and the transaction as a whole. *Id.*

The correlation between "series of related acts or omissions" and "causation" is apparent after examining arguments made by claimants in other multiple-act cases and the manner in which some courts have interpreted similar words when not expressly defined in the policy. *See, e.g., Home Indemnity Co. v. City of Mobile,* 749 F.2d 659 (11th Cir.1984) (200 homeowners argued that "occurrence" should be defined in terms of the resulting damage to each of their properties—court holds that number of "occurrences" depends upon the number of causative acts, not the number of injuries resulting); *Travelers Indemnity Co. v. New England Box Co.,* 102 N.H. 380, 157 A.2d 765, 767 (1960) (several parties tried to collect "per accident" policy limits for damage to each of their properties—words held to refer to multiple causes rather than multiple effects); *Bacon v. Miller,* 113 N.J. Super. 271, 273 A.2d 602 (1971) (plaintiff claimed more than one "accident" when car involved in collision careened into several pedestrians—court restricted recovery to limit for one accident). These cases compel the conclusion that the number of causative acts is the key to interpreting "per occurrence" clauses.

We think it clear that Imperial limited "occurrence" by using the term "series of related incidents . . ." to protect itself from the contention that multiple, causally-connected negligent acts constituted more than one occurrence. The Fund reflected this concern in its briefs when it argued that under survivors' interpretation, "[i]t is foreseeable that each and every time any doctor saw or examined a patient, such failure to accurately re-diagnose the condition would constitute a separate occurrence." Limiting coverage for separate "occurrences" by construing a series of causally connected acts or omissions to be a single occurrence would address this concern adequately.

The Fund also argues that there was only one "occurrence" because there was only one injury. The cases, however, show that the number of causative acts, and not the number of injuries produced, determines the number of "occurrences." *See, e.g., St. Paul Fire & Marine Insurance Co. v. Hawaiian Insurance & Guaranty Co.,* 2 Haw.App. 595, 596, 637 P.2d 1146, 1147 (1981) (separate claims made out each time doctors negligently administered anesthetic to patient-decedent—all causing a single result, death); *McQuaig, supra* (each of three shotgun blasts fired by homeowner was a separate "occurrence" although blasts only injured two people); *see also Maurice Pincoffs Co. v. St. Paul Fire & Marine Insurance Co.,* 447 F.2d 204 (5th Cir.1971) (each of eight sales of contaminated bird seed was a separate "occurrence" because each separate sale subjected the insured to liability); *St. Paul-Mercury Indemnity Co. v. Rutland,* 225 F.2d 689 (5th Cir.1955) (one "occurrence" when 16 freight cars owned by 14 different owners destroyed in a *single* accident); *Home Indemnity Co., supra* (each discrete act or omission or series of acts or omissions, by city which caused flooding is an "occurrence"); *Colbert County Hospital Board v. Bellefonte Insurance Co.,* 725 F.2d 651 (11th Cir.1984) (patient could recover for three "claims" against hospital for three separate surgeries negligently performed by same doctor—each surgery allegedly producing separate injury).

■ Thus, we conclude that the number of acts producing injury or damage, rather than the number of injuries caused, is the key on which the definition of "occurrence" turns. Multiple acts causing a single injury will constitute multiple occurrences, while a single act will constitute a single occurrence even though it causes multiple injuries or multiple episodes of injury. It follows that Imperial's use of the word "related" in the phrase "series of related acts" was meant to exclude *causally related* acts from the rule that multiple causative acts constitute multiple occurrences. Therefore, we hold that the proper construction of Imperial's definition is that

even though there have been multiple causative acts, there will be a single "occurrence" if the acts are causally *related to each other* as well as to the final result. We now turn to the record to see if it contains information from which a factfinder could infer that the omissions of the two doctors were causally connected to each other and thus constituted only one "occurrence."

▪ The record shows that Worsham's treating physician requested Eisenbeiss to do a neurological consultation after Worsham's April 29, 1975 accident. Eisenbeiss either failed to review Worsham's x-rays or, reviewing them, failed to recognize the problem, and thus did not diagnose or report a fracture dislocation of the spine. On May 1, 1975, Worsham's condition deteriorated and Helme, who was on call while Eisenbeiss had the day off, performed emergency surgery. During a 1979 deposition, Helme stated that he had examined Worsham's spinal x-rays before operating. In June 1982, he admitted that he had not followed his usual practice and had not looked at the x-rays before operating on Worsham. Helme conceded that had he done so and seen the fracture dislocation, he would have immobilized Worsham during surgery. The surgery without immobilization is alleged to have caused Worsham's spinal cord injury, hastening his quadriplegia and resulting death.

In essence, therefore, survivors claim that both doctors were negligent in failing to look at the x-rays in connection with separate activities—consultation and surgery. Each of the diagnostic failures allegedly was a cause of injury and contributed to the ultimate result—death. The doctors' failures clearly were separate causal acts of separate doctors on separate days. Nothing in the record indicates that Eisenbeiss's conduct caused Helme to fail to

examine the x-rays.[7] Certainly, on this record the finder of fact could not find a causal connection. Accordingly, we find that the trial court did not err in holding that the doctors' omissions constituted two occurrences under the Imperial policy, and that survivors could recover for two "covered claims." We affirm the trial court's grant of partial summary judgment in favor of survivors on this issue.

## C. *Breach of Duty of Cooperation*

▪ The Fund contends that if the doctors' omissions did give rise to two "covered claims," its obligation to pay survivors on the second claim has been discharged by the doctors' collusion and breaches of the express duty of cooperation and implied duty of good faith. The Imperial policy contains a standard cooperation clause: the insured "shall not, except at his own cost, voluntarily make any payment, assume any obligation, or incur any expense." The guaranty law required Helme and NSPC to cooperate with the Fund to the same extent they would have been required to cooperate with Imperial. A.R.S. § 20–667(A).[8] Helme and NSPC breached this duty to cooperate, according to the Fund, and "were obviously willing to say anything necessary to save their personal backsides." The Fund contends that Helme and NSPC "set it up" by entering into an unauthorized settlement and by creating "an alleged 'claim' so that both groups could profit at the expense of public funds."[9]

▪ A cooperation clause such as Imperial's is used to protect the insurer's right to a fair adjudication of the insured's liability and to prevent collusion between the insured and the injured person. 8 J. APPLEMAN, *supra* § 4771, at 213 (1981). Ordinarily, an insured's breach of the cooperation clause relieves a prejudiced insurer

---

7. The Fund tries to establish a causal connection by arguing that the omissions were "related" because Helme would not have operated on Worsham had it not been Eisenbeiss's day off. We believe this argument stretches the concept of causation to the point where every act is causally connected to every subsequent event. *See* W. PROSSER & W. KEETON, THE LAW OF TORTS § 41, at 264 (5th ed. 1984).

8. Renumbered A.R.S. § 20–672(A) (Supp.1986).

9. We are puzzled by the allusion to public funds. The Fund is created by assessment against insurers and is a cost of doing business. No tax funds are involved. *See* A.R.S. §§ 20–662 and 20–666 (Supp.1986).

of liability under the policy. *Globe Indemnity Co. v. Blomfield*, 115 Ariz. 5, 8, 562 P.2d 1372, 1375 (App.1977); 8 J. APPLEMAN, *supra* § 4772, at 215. Insurance policies, however, are governed by the basic contract law principle that if one party to a contract breaches the agreement, the other party is no longer obligated to perform his or her contractual obligations. A. WINDT, INSURANCE CLAIMS AND DISPUTES: REPRESENTATION OF INSURANCE COMPANIES AND INSUREDS § 3.10, at 97 (1982); 8 J. APPLEMAN, *supra* § 4786, at 316. Throughout this litigation, survivors have claimed that the doctors were justified in settling the claims against them because the Fund had breached the material obligations of the insurance contract first. Survivors suggest that the Fund "abandoned" its insureds by breaching both its express duties to defend and indemnify, and its implied duty of good faith. Because we find as a matter of law that the Fund anticipatorily repudiated its duty to indemnify, we need not address the other breaches raised by survivors.

The insurance policy expressly obligated Imperial to indemnify Helme and NSPC (for its vicarious liability for Helme's acts) against all sums they became legally obligated to pay as damages because of injury arising out of Helme's professional malpractice. This duty is the most fundamental of an insurer's obligations. A. WINDT, *supra* § 6.01, at 225. In purchasing an insurance company's express agreement to pay covered claims, the insured is buying "security from financial loss which he may sustain from claims against him...." *Rawlings v. Apodaca*, 151 Ariz. 149, 154, 726 P.2d 565, 570 (1986).

▮▮▮ The Fund interpreted the statutes and the Imperial policy as obligating it to pay a maximum of $99,900, no matter what amount of damages were found at trial. The Fund admits that it told its insureds that it would pay only one covered claim. This contraction of coverage was based on the Fund's erroneous interpretation of the policy's "occurrence" definition. We recently stated that a party which repudiates its contract obligations on the basis of an incorrect interpretation of a contract has committed an anticipatory breach. *Snow v. Western Savings & Loan Association*, 152 Ariz. 27, 33–34, 730 P.2d 204, 210–11 (1986). The Fund, therefore, anticipatorily breached its contractual and statutory obligations as a matter of law.

▮▮▮ As a general matter, insurance carriers owe their insureds three duties, two express and one implied. These are the duties to indemnify, the duty to defend, and the duty to treat settlement proposals with equal consideration. *See generally* A. WINDT, *supra* § 4.01 to § 6.37, at 100–297. Any breach, actual or anticipatory, of these duties deprives the insured of the security that he has purchased because the breach leaves him exposed to personal judgment and damage which may not be covered or may exceed the policy limits. Accordingly, when such a breach occurs, the insured is generally held to be freed from his obligations under the cooperation clause. *Damron v. Sledge*, 105 Ariz. 151, 460 P.2d 997 (1969); *State Farm Mutual Automobile Insurance Co. v. Paynter*, 122 Ariz. 198, 593 P.2d 948 (App.1979); A. WINDT, *supra* §§ 3.10 to 3.11, at 97–99.

Although the insurers in *Damron* and *Paynter* breached by refusing to defend, the principle of those cases remains the same: once an insurer breaches any duty to its insured, the insured is no longer fully bound by the cooperation clause. *Accord* 7C J. APPLEMAN, *supra* § 4714; A. WINDT, *supra* § 3.10, at 97 and § 4.09, at 120. No other rule is sensible. The insured exposed by his insurer "to the sharp thrust of personal liability ... need not indulge in financial masochism...." *Damron*, 105 Ariz. at 153, 460 P.2d at 999, quoting *Critz v. Farmers Insurance Group*, 230 Cal.App.2d 788, 801, 41 Cal. Rptr. 401, 408 (1964).

> Whatever may be [the insured's] obligation to the carrier, it does not demand that he bare his breast to the continued danger of personal liability. By [settling], he attempts only to shield himself from the danger to which the company has exposed him.... The insurer's

breach so narrows the policyholder's duty of cooperation that the self-protective [settlement] does not violate it.

*Critz*, 230 Cal.App.2d at 801–02, 41 Cal. Rptr. at 408–09.

We do not hold that the insurer's anticipatory repudiation eliminates the insured's duty of cooperation so that the insured may enter into *any* type of agreement or take *any* type of action that may protect him from financial ruin. We hold only that once the insurer commits an anticipatory breach of its policy obligations, the insured need not wait for the sword to fall and financial disaster to overtake. The insurer's breach narrows the insured's obligations under the cooperation clause and permits him to take reasonable steps to save himself. Among those steps is making a reasonable settlement with the claimant. So long as that settlement agreement is neither fraudulent, collusive, nor otherwise against public policy, the insured has not breached the cooperation clause.

Damron agreements are not inherently collusive or fraudulent. *Paynter*, 122 Ariz. at 201, 593 P.2d at 951; *Miller v. Shugart*, 316 N.W.2d 729, 734 (Minn.1982). The insureds did not breach their duty of cooperation merely by entering into the Damron agreement to protect themselves after the Fund denied the full extent of its potential financial responsibility, thus abandoning its duty to indemnify and to fairly consider settlement proposals. *See Communale v. Traders & General Insurance Co.*, 50 Cal.2d 654, 328 P.2d 198 (1958). The court of appeals erred in holding that the making of the Damron agreement, without more, was a breach of the cooperation clause. The parties have not argued, and this opinion does not reach, any issue regarding the extent to which the stipulations which form part of the settlement agreement are binding upon the insurer.

This case must be remanded for a factual determination of issues not resolved by the partial summary judgment. These include the question of whether Helme and NSPC fraudulently misreported Helme's treatment of Worsham.

## CONCLUSION

Survivors may recover for two covered claims because the doctors' negligent omissions constituted two "occurrences" under the Imperial policy. The Fund is not discharged from paying on the Helme claim because its insureds entered into a Damron agreement; once the Fund anticipatorily repudiated its duty to indemnify the doctors for two claims, the doctors were free to protect their assets by entering into a reasonable settlement agreement.

The decision of the court of appeals is vacated in part. The trial court's grant of partial summary judgment in favor of survivors is affirmed and the case is remanded for proceedings consistent with this opinion.

GORDON, C.J., and CAMERON and HOLOHAN, JJ., concur.

JACK D.H. HAYS, J., participated in the determination of this matter but retired before the opinion was filed.

JAMES MOELLER, J., did not participate in the determination of this matter.