812 P.2d 1002

## STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, a foreign corporation, Plaintiff–Appellant, Cross Appellee,

v.

## Judy Sue PEATON, an individual; Deborah Hoffman, individually and as conservator/guardian ad litem for Joseph S. Wheeler, a minor; Larry L. Wheeler, father of Joseph S. Wheeler, an individual, Defendants–Appellees, Cross Appellants.

### No. 1 CA–CV 88–557.

Court of Appeals of Arizona, Division 1, Department B.

Nov. 15, 1990.

Review Denied July 10, 1991.

O'Connor, Cavanagh, Anderson, West-over, Killingsworth & Beshears by Steven D. Smith and Larry L. Smith, Phoenix, for plaintiff-appellant, cross appellee.

Crowe & Scott, P.A. by Paul M.B. de Blank, Phoenix, for defendants-appellees, cross appellants Hoffman & Wheeler.

Langerman, Begam, Lewis & Marks by Robert G. Begam, Phoenix, for defendant-appellee, cross appellant Peaton.

OPINION

JACOBSON, Judge.

The primary issue in this appeal is whether an insured whose insurer has offered its policy limits to an injured plaintiff is absolutely entitled to enter into a "Damron"[1] agreement with the plaintiff against the wishes of the insurer.

State Farm Mutual Automobile Insurance Company appeals from a summary judgment in which the trial court declared that it was liable for the full extent of its $50,000 insurance policy issued to appellee Judy Sue Peaton. The court also found that State Farm owed interest on a judgment which the appellees-claimants had recovered against Peaton in the amount of $5,350,251.20. The appellees have cross-appealed from the trial court's determination that interest would cease to accrue once State Farm paid the policy limits.

## I. FACTS AND PROCEDURAL HISTORY

The appellees in this case are Joseph S. Wheeler (Joey), his mother, Deborah Hoffman (Hoffman), and his father, Larry L. Wheeler (Wheeler), referred to collectively as the "claimants," and Judy Sue Peaton, State Farm's insured.[2] This case arises from a collision occurring on January 7, 1986 between Peaton, in her car, and Joey, on his bike. The accident severely injured Joey, leaving him a severely retarded, brain-damaged, spastic quadriplegic. Hoffman hired attorney Paul M.B. de Blank to pursue any legal remedies.

### A. *Early Negotiations*

On February 11, de Blank wrote a letter to State Farm's claims department regarding the accident. After setting forth his version of the facts of the accident and describing Joey's current condition, Mr. de Blank wrote:

I recognize that in any case of this nature, the defense will try to claim that the accident was unavoidable or that the victim was contributorily negligent. I am *sure* you will agree that the accident was *not* unavoidable. Furthermore, given Joey's age, the defense of contributory negligence will be very difficult. Under the doctrine of comparative negligence, even a finding of some fault on the part of Joey will still result in an astronomical verdict. Accordingly, unless the coverage is extremely high, this clearly is a policy limits case.

... I now have been told that only $50,000 of coverage exists.... On behalf of Joey Wheeler, I therefore demand that State Farm tender the policy limits immediately, and in any event, no later than February 21, 1986. If tendered on or before that date, the policy limits will be accepted in exchange for a release of your insured's liability, provided the following conditions are met.

First, the policy limits are to be placed into a segregated, interest-bearing account pending final resolution of the claim.

Second, within a reasonable time, State Farm is to submit a certified policy to provide written proof of the policy limits.

Third, Ms. Peaton must provide a sworn financial statement showing personal assets (and marital community assets, if applicable) of less than $30,000, and must agree to a sworn examination, to be recorded by a court reporter, during which she will be asked about the financial statement and the existence of other entities or policies which may provide compensation.

Guardianship proceedings for Joey were initiated in Iowa, Joey's permanent residence. No settlement could be made final until the Iowa court had approved the settlement and appointed a conservator to sign it.

---

1. *Damron v. Sledge,* 105 Ariz. 151, 460 P.2d 997 (1969) held that an insured could assign all claims against its insurer for bad faith to an injured third party. In Arizona, these assignments have been known as "Damron Agreements."

2. As explained later, Peaton's status in this litigation is nothing more than that of a nominal party.

On February 20, State Farm claims representative Jane Rockwell phoned Peaton to advise her of de Blank's settlement demand and the possible need for her to retain separate legal counsel. She also sent Peaton a letter dated February 21, 1986 which stated:

As per our telephone conversation on Thursday, February 20, 1986, I am attaching, with this letter, correspondence received from Attorney Paul M.B. de Blank, who represents Joey Wheeler and his mother, Deborah Hoffman, for injuries received in the accident on January 7, 1986.

As discussed with you, Mr. de Blank has made a demand for our policy limits of $50,000. I am also enclosing our letter of response to the attorney.

Because of the possible exposure to you, you may feel it necessary to retain counsel to represent you.

On February 21, Rockwell responded to de Blank's letter. She disputed de Blank's version of who was at fault and requested more time to investigate. On February 21, de Blank wrote Rockwell a letter responding to her hand-delivered letter. He wrote that he found it hard to believe that State Farm would not realize that Joey's injuries would certainly exceed the policy limits, as evidenced by his prolonged (and not-yet-ended) hospital stay. He continued:

However, to answer any concern that the injuries may not warrant tender of the $50,000.00 policy limits, I am happy to agree that it will be sufficient for State Farm to tender its policy limits *expressly conditioned* on its thereafter receiving proof that Joey Wheeler 1) is in a coma and 2) suffered a severe brain injury. That way, State Farm can take it as established, for purposes of the demand, that such injuries have indeed been sustained. (Emphasis added.)

On February 24, de Blank and Rockwell had a telephone conversation regarding the settlement proposal. De Blank confirmed the conversation with a letter of the same date:

I do not believe it is reasonable to hold up the settlement determination for medical reasons.

However, I will try to obtain copies of Joey's most important medical records, and hope to have those by the end of this week. Even if those records are not yet available, the revised policy limits demand expressly permits State Farm to tender its policy limits *contingent upon* thereafter receiving proof that Joey Wheeler is in a coma and suffered severe brain injury. In other words, should it later be learned that somehow Joey Wheeler's injuries are not as described, acceptance of the settlement demand could be revoked by State Farm.

This way, Joey's mother will have the peace of mind of knowing that that case has been settled and that the necessary funds have been set aside, at interest. She can then approach her own carrier for the Underinsured Motorist benefits, and commence arrangements for Probate court approval. Minimizing the delay is a primary reason why she would be willing not to pursue your insured's personal assets. (Emphasis added.)

Accordingly, I repeat the demand that (even in the absence of complete medical proof) State Farm convey its (conditional) tender of the policy limits.

The deadline for responding to this demand is hereby formally extended to 5:00 p.m., Friday, March 7, 1986.

... Also enclosed is a copy of the Complaint to be filed against your insureds [sic] in the near future. Filing and service of the Complaint does not affect the settlement demand, provided State Farm conveys its acceptance thereof prior to the above deadline.

The complaint was filed on February 27, in cause No. C–571345. (That suit will be referred to as the "liability" suit.)

On March 5, 1986, Rockwell and de Blank had a telephone conversation in which they thought they reached a settlement. According to Rockwell, she told de Blank that State Farm agreed to pay the $50,000 on the express condition that de Blank first obtain approval from the pro-

bate court in Iowa, and that the conservator be authorized to execute a full release. Rockwell maintains that de Blank accepted this with only two conditions: (1) that State Farm certify that the policy limit was $50,000; and (2) that State Farm make Peaton available for a sworn examination to show that she had no further substantial assets with which to satisfy Joey's damages. According to Rockwell, the previous demand for interest on the $50,000 had been dropped as of de Blank's "revised" offer of February 21 and was not included in the settlement agreed to on March 5. De Blank, on the other hand, claims that his "revised" settlement demand included interest on the $50,000.

There were further conversations between Rockwell and de Blank after the March 5 "agreement," but the issue of interest apparently was not discussed. Rather, Rockwell and de Blank set about making arrangements to finalize the settlement. Then, on April 8, 1986, de Blank wrote a letter to Rockwell:

> I just learned that a hearing has been set for Probate Court proceedings in Iowa on May 9, 1986. Presumably, at that time the Court will approve the policy limits settlement previously arrived at and shortly thereafter I hope to be able to send you a certified copy of the Iowa Probate Court's Order directing State Farm to issue its check for the proceeds....
>
> One issue which has not yet been nailed down is the question of interest. As I mentioned in the first paragraph of page 3 of my letter dated February 11, 1986, one of the conditions of the policy limits settlement was that the proceeds would be placed into a segregated, interest-bearing account pending the final resolution of the claim. The Probate Court proceedings are being conducted at the expense of the Wheelers, even though they are really for the benefit of Ms. Peaton and State Farm, to protect them against possible and consistent [sic] liability. In light of the above, and considering that it is hardly Joey Wheeler's fault that State Farm (quite reasonably, I agree) will not pay its limits until after

an appropriate Court Order has been entered, I really must insist that in addition to the $50,000.00 face amount, State Farm pay reasonable interest on that amount from March 5, 1986—the date the limits were tendered—to whatever date that payment ultimately is made.

Rockwell referred the matter to claims superintendent Donald Hancock, telling him that she thought the interest demand was contrary to the settlement agreed to on March 5. Hancock then wrote to de Blank:

> Concerning the payment of the interest on the settlement, it is our position that until the Court has appointed a conservator, and has approved the settlement, no payment can be made and no interest can begin to accrue. Upon receipt of the approval of the Court and the name of the conservator appointed by the Court, we will then promptly issue our draft in the amount of $50,000.

De Blank called Hancock informing him it was his position that interest had always been included in the settlement offer, and had been accepted by Rockwell. De Blank told him that if State Farm refused to pay interest, the settlement would be called off. De Blank asserts he warned Hancock that this would potentially expose Peaton to a multi-million dollar verdict.

On April 29, 1986, State Farm retained attorney Ronald W. Collett to represent Peaton in the matter. At that time, Collett advised Hancock that he knew of no legal authority requiring State Farm to pay interest prior to execution of the settlement documents. He also told Hancock that Joey's father, Larry Wheeler, would have to be a part of any settlement because of his possible claim for a loss of consortium. Mr. Collett then called de Blank, informing him that the policy limits were still available, but that no legal authority required the payment of interest and that Larry Wheeler would have to be involved in the settlement. He further told de Blank that he would be filing an answer for Peaton in the liability suit. Collett asserts that no ultimatums were expressed if the answer was filed. On May 2, 1986, Collett filed the

answer and wrote a letter to de Blank again offering to settle the matter for $50,-000.

After further discussions with de Blank, Collett advised Hancock that, while State Farm had no legal duty to pay interest on its policy limits, he recommended State Farm do so. State Farm agreed and Collett was instructed to convey this offer to de Blank. On May 9, Collett phoned de Blank to convey State Farm's willingness to pay the policy limits plus interest. De Blank told him that the filing of the answer constituted a rejection of the offer and that settlement on those terms was no longer available. Collett asserts this was the first he had heard of such a condition and that, had he known of it, he would not have filed the answer. Collett followed up the conversation with a letter reiterating the "misunderstanding" and told him that State Farm continued to be willing to pay $50,000 plus 10% interest from March 5, 1986, the date of the aborted acceptance of the settlement offer.

De Blank rejected this offer and immediately sought to reach a Damron agreement with Collett, and then with attorney Frederick Gamble whom Peaton later hired to represent her in the negotiations. After the terms of agreement were settled, but prior to signing, Gamble demanded that State Farm agree to indemnify Peaton for whatever judgment the claimants might recover against her in the liability suit; unless State Farm agreed to do so, Peaton would sign the Damron agreement. State Farm refused and warned that Peaton's signing the agreement would void coverage as being violative of the policy. The claimants and Peaton then signed the Damron agreement.

## B. *The Damron Agreement*

In the agreement, to which Peaton has sworn, she asserts:

> At no time prior to filing the Answer did State Farm or the attorneys hired by

State Farm to defend Judy Peaton inform her that the settlement was in jeopardy. Judy Peaton was informed by the attorneys hired by State Farm to defend her that, in order to settle the claim against her, interest was being demanded in addition to the payment of the policy limit. The attorneys hired by State Farm to defend her did not inform her what, if anything, State Farm intended to do about the demand for interest or that she had the option to pay the interest herself in order to complete the settlement.[3]

In the agreement, Peaton continued to disclaim any fault for the accident. Nonetheless, she agreed not to contest the issue of liability. Peaton and the claimants agreed to the following:

—The complaint would be amended to add Larry Wheeler as plaintiff to assert his claim for loss of consortium;

—Peaton would allow the suit to go by default;

—The parties would request a damages hearing, at which the judge would be informed of the agreement, and which Peaton and her attorney could attend, but the attorney's participation would be limited to cross-examination of the claimants' witnesses; he would not be allowed to object to any of the claimants' evidence and would not be allowed to introduce any rebuttal evidence;

—The damages awarded by the judge could not be reduced by more than 10% for any contributory fault on Joey's part;

—The claimants would not execute on the judgment for twenty days, to allow Peaton to demand that State Farm pay the judgment;

—If State Farm refused to pay the judgment, Peaton could elect to sue State Farm for bad faith, and if she did so within ten days after State Farm's refusal, the claimants would stay further collection efforts against her;

---

**3.** In her affidavit submitted with the appellees' papers on the motions for summary judgment, Peaton asserted that State Farm had never informed her of any settlement proposals. As noted, Rockwell's affidavit outlined her communications with Peaton on this subject on February 21 and 22. On appeal, appellees have not asserted Peaton's original allegation.

—Peaton assigned to the claimants all her rights in her bad-faith lawsuit against State Farm, agreed to cooperate fully with them in both their suit against her and her suit against State Farm, and allowed the claimants to choose her attorneys for the bad-faith action;

—The claimants would reimburse Peaton for her costs and attorneys' fees in the suit against State Farm, and Peaton would pay the claimants any fees and/or costs she might be awarded;

—If Peaton performed all of her obligations under the agreement, the claimants would (a) not record the judgment against her; (b) explain the situation to her creditors; (c) stay all collection efforts against her until her suit against State Farm was concluded; and (d) would not execute against her on the judgment, except to the extent of the policy limits if the suit against State Farm proved unsuccessful.

Finally, the parties agreed that if the effect of the Damron agreement was to void Peaton's coverage under State Farm's policy, then the claimants would not seek to recover "from Judy Peaton the difference between the automobile liability insurance coverage available to her prior to executing this Settlement Agreement and the ... coverage available to her after this Settlement Agreement is declared null and void." Thus, Peaton had no personal exposure.[4]

The damages hearing was held before Judge Gloria Ybarra. State Farm moved to intervene, but Judge Ybarra denied the motion and State Farm did not appeal. Judge Ybarra later returned a judgment against Peaton for $5,350,251.20, which Gamble demanded that State Farm pay. State Farm refused.

State Farm had, in the interim, filed this declaratory judgment action seeking a declaration that Peaton's signing of the Damron agreement violated the cooperation clause of her policy and thus voided coverage. Peaton and the claimants filed separate answers. The claimants' answer requested the court to find not only that coverage was not voided, but also that State Farm was liable for the entire amount of the judgment they recovered against Peaton in the liability suit. The appellees have also filed an additional action against State Farm asserting a bad-faith claim (the "bad faith action").

State Farm's declaratory judgment action is based upon the theory that Peaton violated both the cooperation and the "no action" clauses of the policy. The cooperation clause provides:

**5. Insured's Duty to Cooperate With Us.**

The *insured* shall cooperate with us and, when asked, assist us in:

a. making settlements;

b. securing and giving evidence;

c. attending, and getting witnesses to attend, hearings and trials.

The *insured* shall not, except at his or her own cost, voluntarily:

a. make any payment or assume any obligation to others; or

b. incur any expense, other than for first aid to others.

The policy also contains a standard "no action clause" in the "Conditions" section:

**2. Suit Against Us.**

There is no right of action against us:

a. until all the terms of this policy have been met; and

b. under the liability coverage, until the amount of damages an *insured* is legally liable to pay has been finally determined by:

(1) judgment after actual trial, and appeal if any; or

(2) agreement between the *insured*, the claimant and us.

Appellees agree that unless Peaton had legal authority to do so, her entering into the Damron agreement constituted a violation of the cooperation provisions of the

---

**4.** Peaton, while clearly a nominal party in these proceedings, has filed briefs in appeal and has orally argued the matter. Peaton is represented by the firm that was selected by Wheeler under their agreement, but she has no liability for attorneys' fees. Her counsel is to be paid 1/6th of any amount collected from State Farm.

policy. They argue, however, that once State Farm offered to pay the $50,000 policy limits, Peaton was free to sign the Damron agreement. For purposes of this argument only, appellees conceded that State Farm's conduct prior to rejection of the settlement offer was irrelevant.

## II. APPELLEES' ARGUMENT

Appellees first argue that once State Farm offered the limits of its policy, even though that offer was ultimately rejected, Peaton had the "absolute right" to extinguish her potential liability in excess of the policy limits. If appellees truly mean that Peaton had the right to extinguish her *excess* liability exposure, then their argument is out of place. State Farm does not contest Peaton's right to settle her personal exposure by reaching an agreement with the claimants, so long as that agreement does not prevent State Farm controlling the defense or insurer liability through a default judgment. The question in this appeal, however, is whether State Farm remains bound to continue its exposure for policy limits even after its insured enters into a Damron agreement without its approval.

The only case appellees cite in support of State Farm's supposed absolute liability is *Lienemann v. State Farm Mutual Auto Fire & Casualty Co.*, 540 F.2d 333 (8th Cir.1976). In *Lienemann*, State Farm had refused to negotiate settlement with the injured party; however, on more than one occasion, it had informed the insured he was "free to settle for any amount over the policy's coverage." *Id.* at 336. The insured failed to settle, however, and when an excess verdict was returned, the insured filed a bad-faith suit against State Farm. *Id.* The issue in *Lienemann*, therefore, was whether State Farm could justify its *failure to offer its limits* by contending that the insured should have reached a settlement for amounts above the policy limits. In this case, State Farm had at all times been willing to settle with claimants for the policy limits and ultimately had offered interest as well. Thus, we find that the issues and facts in *Lienemann* are so far removed from the present case that

they are not helpful in resolving the question before us on this appeal.

Finally, if appellees are seriously asserting that Peaton's so-called "absolute right" to settle means that she *could not* have violated the cooperation clause of her contract by entering the Damron agreement once State Farm had offered the policy limits, and further that State Farm remains fully liable *simply because it had offered* the policy limits, we reject this argument out of hand. We have found no case which would support such a theory.

### A. Whether Peaton's Signing of the Damron Agreement was a Violation of the Cooperation Clause

■ Appellees' alternative argument is that, even if Peaton had no "absolute right" to enter into a Damron agreement, nevertheless, she did not breach the cooperation clause by doing so because her motive was solely to avoid potentially catastrophic personal liability. Again, appellees assert that this is so regardless of State Farm's conduct. To support this proposition, appellees point to the Arizona Supreme Court's recent decision in *United Services Automobile Association v. Morris*, 154 Ariz. 113, 741 P.2d 246 (1987).

Appellees argue that *Morris* stands for the proposition that whenever an insured faces potentially catastrophic excess liability, she is free to sign a Damron agreement and the insurer will be bound by the resulting liability. They assert that *Morris* allows this even if the insurer has acted properly in all respects, provided the insured demands indemnity for her entire potential liability.

Appellees apparently base their entire argument on a single statement in *Morris*: "[W]hile USAA did not 'abandon' its insured by breaching any policy obligation, neither did it accept full responsibility for the liability exposure." 154 Ariz. at 118, 741 P.2d at 251. According to appellees, the *Morris* court's holding was that the insureds there did not breach the cooperation clause of their insurance contract because they were motivated by a legitimate need to save themselves from financial

ruin; thus, their settlement with the claimant did not enable USAA to void coverage under their policy. Appellees further argue that this rationale is applicable here as well because Peaton too was "in a position where settlement [was] necessary for [her] own protection rather than from a lack of cooperation with the insurer." *Morris,* 154 Ariz. at 119, 741 P.2d at 252.

We do not find it surprising that Peaton chose to sign the Damron agreement. The agreement, after all, gave her 100% assurance of suffering no financial consequences regardless of the amount of a verdict against her even though she had purchased and paid for only $50,000 worth of coverage. Nevertheless, we do not agree with appellees that, because the agreement may have been necessary for Peaton's financial security, she was thereby relieved of her obligation under her contract to cooperate with the insurer. Appellees' argument to the contrary takes *Morris* much too far and ignores the critical fact that the insureds in *Morris* were freed from their cooperation duties under their policy because the insurer had caused their financial predicament *by defending under a reservation of rights.* In contrast, here State Farm had neither denied coverage nor defended under a reservation of rights.

In other words, although the insureds in *Morris* had the benefit of a legal defense provided by the insurer, they also faced the very real possibility that USAA would pay nothing if the claimant won a judgment. Thus, the insurer's reservation of rights amounted to the insurer not accepting full responsibility for its insureds' liability exposure and allowed the insureds to sign a Damron agreement without being in violation of the cooperation clause. 154 Ariz. at 121, 741 P.2d at 254.

■ Here, the insured never faced the possibility that State Farm might pay nothing if she was found liable. To the contrary, State Farm had continually offered its policy limits and eventually had agreed to pay interest as well. Clearly, *Morris* does not hold that an insured may settle with the injured party simply because the insurer declines to pay *more* than the

amount of coverage the insurer purchased. In fact, the *Morris* court negated such an argument when it stated that an insured "may not settle with the claimant without breaching the cooperation clause unless the insurer first breaches one of its contractual duties." *Id.* at 117, 741 P.2d at 250. We agree with *Morris* that for an insured to be free to sign a Damron agreement without simultaneously voiding coverage, the insurer must have done something in violation of its contract which placed the insured in jeopardy.

The trial court, in granting summary judgment, erroneously relied on *Arizona Property & Casualty Insurance Guaranty Fund v. Helme,* 153 Ariz. 129, 735 P.2d 451 (1987), for the proposition that "[a]s a matter of law, the making of a Damron agreement, without more, is not a breach of a cooperation clause." Although the *Helme* court found that Damron agreements are not "inherently collusive or fraudulent," *id.* at 138, 735 P.2d at 460, the court also stated that "ordinarily, an insured's breach of the cooperation clause relieves a prejudiced insured of liability under the policy." *Id.* at 136–37, 735 P.2d at 458–59. Thus, both in *Helme* and here, the key question is whether the insurer first breached any of its contract obligations to its insured. Only when such a breach has occurred will an insured be excused from his obligations under a cooperation clause. *Id.* at 137, 735 P.2d at 459. The supreme court has made this clear:

As a general matter, insurance carriers owe their insureds three duties, two express and one implied. These are the duties to indemnify, the duty to defend, and the duty to treat settlement proposals with equal consideration. *See generally* A. WINDT, [INSURANCE CLAIMS AND DISPUTES: REPRESENTATION OF INSURANCE COMPANIES AND INSUREDS] § 4.01 to § 6.37, at 100–297 [ (1982) ]. Any breach, actual or anticipatory, of these duties deprives the insured of the security that he has purchased because the breach leaves him exposed to personal judgment and damage which may not be covered or may exceed the

policy limits. Accordingly, when such a breach occurs, the insured is generally held to be freed from his obligations under the cooperation clause. *Damron v. Sledge*, 105 Ariz. 151, 460 P.2d 997 (1969); *State Farm Mutual Automobile Insurance Co. v. Paynter*, 122 Ariz. 198, 593 P.2d 948 (App.1979); A. WINDT, *supra* §§ 3.10 to 3.11, at 97–99.

Although the insurers in *Damron* and *Paynter* breached by refusing to defend, the principle of those cases remains the same: once an insurer breaches any duty to its insured, the insured is no longer fully bound by the cooperation clause. *Accord* 7C J. APPLEMAN, [INSURANCE LAW & PRACTICE] § 4714 [(1979)]; A. WINDT, *supra* § 3.10, at 97 and § 4.09, at 120. No other rule is sensible. The insured exposed by his insurer "to the sharp thrust of personal liability ... need not indulge in financial masochism...." *Damron*, 105 Ariz. at 153, 460 P.2d at 999, quoting *Critz v. Farmers Insurance Group*, 230 Cal. App.2d 788, 801, 41 Cal.Rptr. 401, 408 (1964).

*Helme*, 153 Ariz. at 137, 735 P.2d at 459.

In *Helme*, the insureds were entitled to sign the Damron agreement because the insurer failed to indemnify. It erroneously claimed its liability limit was $99,000 when in fact the limit was actually $199,800. Here, there was never any doubt that: (a) State Farm had offered and was providing an unequivocal defense of Peaton, without any reservation of rights; and (b) State Farm was offering to pay its entire potential liability of $50,000. Under both *Morris* and *Helme*, Peaton could have been justified in signing the Damron agreement only if State Farm had breached one of its duties to her. State Farm breached no express contractual obligations.

■ Appellees next argue that even if Peaton breached the cooperation clause, this cannot vitiate coverage because State Farm suffered no actual prejudice. Ordinarily, a finding of prejudice is necessary

to relieve an insurer of its obligations. *Holt v. Utica Mut. Ins. Co.*, 157 Ariz. 477, 484, 759 P.2d 623, 630 (1988).

Appellees maintain that, leaving aside any claim for bad faith (which is to be litigated not in this case, but in their bad-faith suit), State Farm's only exposure resulting from the Damron agreement is the policy limits.[5] They contend that, because State Farm had offered and was always *willing* to pay this $50,000, it can suffer no prejudice by now being required to do so.

Appellees' argument ignores the principle that settlement of insurance claims is a matter of contract law. Therefore, "all the elements of a valid contract must be found. Thus there must be a meeting of the minds, identity of subject matter, and consideration." J. Appleman, 7C *Insurance Law & Practice* § 7415 at 556 (1979). Appellees' theory would neither require them to accept State Farm's offer, nor give consideration, in order to take *full* advantage of that offer. According to appellees, regardless of whether State Farm received what it bargained for—release of liability as to its insured—State Farm is still required to pay its policy limits—a completely uncalled for result.

Appellees would have us hold that once an insurer has offered to pay the policy limits, it *must* pay the policy limits, regardless of any acceptance or rejection of the offer. In effect, the insurer could never revoke a policy-limits offer; the insured and the claimants would be free to negotiate any deal they could imagine, secure in the knowledge that the insurer would always be bound to pay the policy limits. Such a rule is insupportable. *See Farmers Ins. Exch. v. Schropp*, 222 Kan. 612, 567 P.2d 1359, 1368 (1977) (where claimant has not accepted the insurer's offer or where claimant has not given any consideration, no enforceable settlement arises).

Although our holding does not depend upon it, we feel compelled to comment on the likely effects of adopting the rule proposed by the appellees. First, as is the

5. Of course, claimants are actually seeking more than policy limits. They requested and the trial court granted interest on $5,350,251.20.

case here, it would allow any insured who was involved in a catastrophic accident in which damages clearly exceed the amount of coverage purchased, to expose the insurer unconditionally to pay policy limits at no risk to the insured. Second, and more importantly, it would cast doubt on the concepts of offer/acceptance and consideration. The effect of such a rule on the settlement of personal injury claims could be disastrous. Were we to hold, as the appellees argue, that an insurer is automatically bound by its mere offer to pay the policy limits even though it receives nothing in return, insurance companies would have little incentive to make policy limit offers. Settlements, even in appropriate cases, would become rare and it would be the injured parties who would suffer most. The effect would be to foster litigation, when the policy of the courts is to strive to prevent litigation. *Schlauch v. Hartford Accident & Indem. Co.*, 146 Cal.App.3d 926, 935, 194 Cal.Rptr. 658, 664 (1983).

There is no support either in logic or by legal authority for the theories proffered by the appellees in support of summary judgment. We now determine whether State Farm's motion for summary judgment, based upon the undisputed facts, should have been granted.

### B.  *Whether State Farm was Entitled to Summary Judgment*

State Farm claims the trial court erred in denying its motion for summary judgment. Before examining this question, we must first determine whether this matter is properly before us.

■ Appellees argue that we should not consider whether State Farm is entitled to summary judgment because the denial of such a motion is not a final judgment and thus is not appealable. *Fleitz v. Van Westrienen*, 114 Ariz. 246, 560 P.2d 430 (App. 1977). However, because this case is already properly before us we can determine whether there are any disputed issues of material fact. If there are none, and one party is shown to be entitled to judgment as a matter of law, we may direct the trial court to enter such a judgment. *See, e.g.,*

*Mealey v. Orlich*, 120 Ariz. 321, 585 P.2d 1233 (1978); *Holt v. Utica Mut. Ins. Co.*, 157 Ariz. 471, 477, 759 P.2d 617, 623 (App. 1987), *vacated on other grounds*, 157 Ariz. 477, 759 P.2d 623 (1988); *Roosevelt Savings Bank of New York v. State Farm Fire & Cas. Co.*, 27 Ariz.App. 522, 526, 556 P.2d 823, 827 (1976).

The rationale behind requiring that only final judgments be appealable is to prevent piecemeal litigation of the case. *Barassi v. Matison*, 130 Ariz. 418, 636 P.2d 1200 (1981). If our review of the record reveals no issues of fact, we prevent piecemeal litigation by ordering the entry of judgment in favor of the party whom, as a matter of law, is entitled to it. To refuse to consider this issue would be to foster piecemeal litigation, not prevent it.

### *Bad Faith Failure to Give Equal Consideration*

■ The court's minute entry granting the appellees summary judgment indicates that it did not completely adopt appellees' theories. Instead, the court found Peaton was justified in signing the Damron agreement because State Farm had failed to give Peaton's interests equal consideration in regard to settlement:

> Although it is clear that an insurer has no obligation to settle a case, it does have a duty to treat settlement proposals with equal consideration.... Although there is no requirement that an insurer involve its insured in making settlements, it extracts from the insured a duty to cooperate and assist in making settlements. If the Plaintiff had involved the insured in the making of a settlement, C 571345 would have been settled. The court finds that because the insurer failed to seek the cooperation of the insured, which failure resulted in increased significant financial exposure to the insured, the insured was well within her legal rights to take reasonable steps to protect her interests on her own.

State Farm, relying on *Morris*, argues that the trial court's finding was incorrect because only two express breaches of the policy can trigger the insured's authority to settle with a claimant before trial: a failure to indemnify and a failure to defend. Con-

sequently, the argument continues, a breach of the insurer's *implied* settlement duties cannot free the insured to breach the cooperation clause by settling with the claimant. State Farm argues that the only remedy for the insured when the insurer breaches its implied settlement duties is an action for bad faith and then only after the insured has suffered an excess judgment following actual trial. In making this argument, State Farm relies upon *Farmers Insurance Exchange v. Henderson*, 82 Ariz. 335, 313 P.2d 404 (1957). *Henderson* is not supportive of this argument as it did not address an insurer's liability for policy limits.

Moreover, the supreme court has made it clear that an insured may enter into Damron agreements in situations other than those involving the insurer's breach of the express duties to indemnify or defend. Although quoted above in regard to the appellees' arguments, the comments bear repeating in this different context:

As a general matter, insurance carriers owe their insureds three duties, two express and one implied. These are the duties to indemnify, the duty to defend, and the duty to treat settlement proposals with equal consideration. Any breach, actual or anticipatory, of these duties deprives the insured of the security that he has purchased because the breach leaves him exposed to personal judgment and damage which may not be covered or may exceed the policy limits. Accordingly, when such a breach occurs, the insured is generally held to be freed from his obligations under the cooperation clause.

Although the insurers in *Damron* and *Paynter* breached by refusing to defend, the principle of those cases remains the same: once an insurer breaches any duty to its insured, the insured is no longer fully bound by the cooperation clause. No other rule is sensible. The insured exposed by his insurer "to the sharp thrust of personal liability ... need not indulge in financial masochism...."

*Helme,* 153 Ariz. at 137, 735 P.2d at 459 (citations omitted). *Accord Morris,* 154 Ariz. at 117, 741 P.2d at 250. Similarly, in *Fireman's Fund Insurance Co. v. Securi-ty Insurance Co. of Hartford,* 72 N.J. 63, 367 A.2d 864 (1976), the New Jersey Supreme Court stated:

Security [appellant] would distinguish those cases and authorities [which allow an insured to settle without losing coverage] because they involve breaches by the insurers of express provisions of the policy requiring the insurer to afford a defense to the insured. That asserted distinction has no validity. It ignores that there is also embodied in the policy contract an implied covenant of good faith and fair dealing with which the insurer must comply before seeking to rely on the powers reserved to it by the language of the policy contract....

....

"The situation presented here does not differ in principle from that in which the insurer denies liability and refuses to defend. While it has been held that under those circumstances there is no duty on the insured to mitigate damages by effecting a favorable settlement, it is well established that the insured may settle and recover from the insurer."

367 A.2d at 868–69, 871, quoting *Evans v. Continental Casualty Co.,* 40 Wash.2d 614, 245 P.2d 470, 479–80 (1952).

We, therefore, reject State Farm's argument that only a breach by the insurer of express provisions of the insurance contract allows the insured to settle with a claimant with impunity.

■ We turn then to whether any facts exist from which a reasonable finder of fact could conclude that State Farm breached any implied obligation under its policy. In this regard, the only implied obligation alleged to have been breached is the duty to treat settlement proposals with equal consideration by State Farm not involving Peaton at the juncture at which the controversy arose over interest and by not allowing her to contribute to the settlement. To assess this assertion requires us to determine *when* the duty to give equal consideration arises for if the duty never arose in this case, obviously the duty could not have been breached.

Relevant case law indicates that an insurer's duty to give equal consideration to the

interest of the insured does not arise until a conflict of interest develops between the insurer and its insured. *Fulton v. Woodford,* 26 Ariz.App. 17, 545 P.2d 979 (1976); *Critz v. Farmers Ins. Group,* 230 Cal. App.2d 788, 41 Cal.Rptr. 401 (1964). The classic situation in which a conflict of interest occurs is when the insurer refuses an offer to settle within policy limits. However, in *Fulton,* we recognized that another area of potential conflict of interest exists "where there is a high potential of claimant recovery and a high potential of damages exceeding policy limits." This court further stated that, in such cases:

> the claimant may not be interested in settlement negotiations, especially where a financially responsible insured is present. In such a case, the insurer has nothing to lose by "going for broke" while the insured stands to suffer financially unless the matter is settled within policy limits or close thereto, which settlement negotiations are completely within the hands of the insurer. Obviously, a conflict of interest under these circumstances is present between the insured and his insurer. Under these circumstances, the better reasoned cases impose upon the insurer the obligation to initiate and attempt settlement and the failure to do so may constitute "bad faith" which would subject the insurer to liability in excess of policy limits.

*Fulton,* 26 Ariz.App. at 22, 545 P.2d at 984.

Here, there is no contention that State Farm was obligated to initiate settlement offers. Rather, after the insurer had offered its policy limits, the claimant's demand was for more, in the form of interest on these limits prior to the time any legal obligation to pay was established. The appellees do not argue that State Farm was legally obligated to pay this amount. State Farm could therefore have no conflict of interest with its insured over whether that amount should be paid. Moreover, when this demand for interest was met, the offer to settle had been withdrawn. Thus, in our opinion, the trial court was incorrect in concluding that State Farm had a legal obligation to involve Peaton in negotiations which exceeded policy limits.

Finally, there is nothing in this record to suggest that State Farm should have been alert to the possibility that its insured's interest was in jeopardy so that it could have involved her in the negotiations. In fact, the negotiations that occurred here appear to follow the expected sequence of offer, counter-offer, insistence on original offer, and finally acquiescence in that offer. In the absence of some evidence that Peaton's involvement was necessary to effect a settlement, even moral obligations to involve her, as compared to legal obligations, are lacking. Therefore, as a matter of law, State Farm breached no obligations, either express or implied, to its insured which would allow the insured to breach her obligation of cooperation.

Based upon the undisputed facts, State Farm was entitled to summary judgment on its claim that, because of Peaton's breach, it was relieved of any obligation to her under her policy. Judgment reversed and remanded with instructions to enter judgment in favor of State Farm.

McGREGOR, P.J., and SHELLEY, J., concur.