Opinion issued September 16, 2004 
















     






In The
Court of Appeals
For The
First District of Texas




NO. 01-00-01406-CV




COLUMBIA CASUALTY COMPANY, Appellant

V.

CP NATIONAL, INC. AND NATIONAL EMERGENCY SERVICES, INC. ,
Appellees




On Appeal from the 189th District Court
Harris County, Texas
Trial Court Cause No. 2000-17720




OPINION ON DENIAL OF EN BANC RECONSIDERATION 

          The court has considered appellees’ motion for en banc reconsideration and is
of the opinion that the motion should be denied. However, we withdraw our opinion
and judgment dated May 27, 2004 and substitute those issued today to clarify our
opinion. 
          This is an appeal from a summary judgment rendered in favor of
appellees/plaintiffs, CP National, Inc. (CPN) and National Emergency Services, Inc,
(NES) in a suit for breach of contract, breach of the duty of good faith and fair
dealing, and declaratory judgment against appellant, Columbia Casualty Company
(Columbia). In its sole point of error, Columbia contends that the trial court erred in
rendering summary judgment on CPN’s and NES’s claim for declaratory judgment
regarding Columbia’s policy limits because the insurance policy provides a single
“per loss event” limit. We reverse and render. 
Facts
          NES’s and CPN’s Suit Against Columbia
          NES is a physician practice management company. CPN is one of its affiliates
that provides emergency room care physicians in the District of Columbia at Sibley
Memorial Hospital. Drs. Richard Doyan and Cooper Pearce are employees of CPN
who worked at Sibley. Columbia provided NES, its affiliates (including CPN), and
physicians under contract with NES coverage under certain professional liability
insurance policies against claims and suits arising out of alleged medical malpractice. 
The Policy at issue is a “Claims-Made Medical Practitioners Policy” that insured NES
and its affiliates and subsidiary companies as “Named Insured” against claims
covered by the Policy and reported to the carrier, Columbia. 
          In 1998, Howard and Jill Flax filed a lawsuit in the Superior Court of the
District of Columbia against Lucy Webb Hayes National Training School for
Deaconesses and Missionaries d/b/a Sibley Memorial Hospital, CPN, Drs. Groover, 
Christie & Merritt, P.C., and Drs. Doyan and Newman. In an amended pleading, Jill
Flax, individually and as personal representative of the deceased Howard Flax, added
Dr. Pearce and NES as additional defendants. Pursuant to the Policy, Columbia
defended NES, CPN, and Drs. Doyan and Pearce. A dispute arose, however,
concerning the applicable limits of the Columbia Policy. Columbia claimed that the
Policy expressly provided for a single “per loss event” limit of liability of $1,000,000. 
NES and CPN argued that the policy afforded a separate $1,000,000 limit each for
claims against Dr. Doyan and Dr. Pearce, totaling $2,000,000. 
          NES and CPN filed a petition in Harris County District Court against
Columbia, alleging breach of contract and breach of the duty of good faith and fair
dealing, and seeking a declaratory judgment concerning the limits of the Policy. Each
party moved for summary judgment. The trial court granted NES’s and CPN’s
motion for partial summary judgment as it related to the declaratory judgment
concerning the dispute over the monetary limits available to NES and CPN. After
disposing of NES’s, CPN’s, and Columbia’s other motions, the trial court entered a
final judgment.
          The Underlying Suit 
          On the evening of December 1, 1996, Howard Flax sought treatment at Sibley
emergency room complaining of persistent fever and a cough. Dr. Doyan, the
emergency room physician on duty, examined Flax and, as part of the physical exam,
ordered a chest x-ray. Dr. Doyan performed a preliminary reading of the x-ray and
concluded that it was negative for pneumonia but that there was possibly a large
lymph node. He diagnosed Flax as suffering from acute bronchitis and proscribed
Hycomine and a Ventolin inhaler; he told Flax to continue taking the antibiotics he
had been taking, and to take Tylenol or Advil if necessary. 
          The next day, Dr. Newman, a radiologist, interpreted the chest x-ray as
“probably normal” and suggested a repeat x-ray in 30 to 60 days to exclude any
growth in the left hilum, which contained very minimal fullness, probably
representing vascular structures rather than pleural disease. He sent his report to the
emergency room that day. Dr. Pearce was the emergency room physician on duty
when the radiology report arrived at the emergency room. As the Director of the
Emergency Department at Sibley, Dr. Pearce was responsible for reporting the x-ray
interpretations from the radiologist to Flax and to his private physician. Dr. Pearce
allegedly failed to inform Flax’s private physician about the x-ray and failed to
communicate to Flax that, although the x-ray looked normal, there was the possible
presence of an abnormality and that a follow-up x-ray was recommended in 30 to 60
days. 
          Flax was later diagnosed as having peripheral T-cell lymphoma, which
ultimately caused his death. The lymphoma was alleged to have been present on
December 1, 1996, when he went to the Sibley emergency room. The Flaxes
contended in their suit that Dr. Doyan misdiagnosed Flax’s condition, misinterpreted
the chest x-ray, and misrepresented to Flax that the results of his x-rays were normal. 
They also argued that Dr. Pearce was negligent in failing to inform Mr. Flax that he
needed to obtain a follow-up chest x-ray because it would have detected the
peripheral T-cell lymphoma much earlier than it was ultimately detected. Overall, the
Flax lawsuit alleged that “the defendants misinterpreted, mishandled, and
miscommunicated the results of Mr. Flax’s chest x-rays taken at Sibley Hospital on
December 1, 1996. As a result . . . the correct diagnosis and initiation of treatment
for Mr. Flax’s cancer was delayed for more than one year. . . [This] delay was a
substantial factor in eliminating or significantly reducing Mr. Flax’s chance of
surviving the disease.” The first complaint included claims for medical negligence
and loss of consortium against Dr. Doyan and CEP, but not against Dr. Pearce or
NES. In her second amended complaint, Mrs. Flax added Dr. Pearce and NES as
defendants and asserted additional claims for wrongful death and a survival action. 
 
Discussion
          Columbia’s sole issue on appeal is whether the trial court erred in rendering
summary judgment for CPN and NES declaring that the Policy afforded a separate
$1,000,000 limit each for Drs. Doyan and Pearce. Columbia contends that the
insurance policy at issue provides only a single limit of liability in the amount of
$1,000,000 for the claims arising out of the injury to Flax. CPN and NES, on the
other hand, argue that the trial court did not err in granting a summary judgment in
its favor and ruling that two separate limits of liability, in the total amount of
$2,000,000, were available under the Policy for the claims made against Drs. Doyan
and Pearce in the Flax lawsuit. 
          Standard of Review
          Summary judgment is proper only when a movant establishes that there is no
genuine issue of material fact and that the movant is entitled to judgment as a matter
of law. Randall’s Food Mkts., Inc. v. Johnson, 891 S.W.2d 640, 644 (Tex. 1995). In
reviewing a summary judgment, we indulge every reasonable inference in favor of the
non-movant, assume that all evidence favorable to the non-movant is true, and resolve
any doubts in its favor. Id. 
          Construction of Insurance Contracts
          Insurance policies are contracts and therefore are controlled by rules of
construction applicable to contracts generally. Barnett v. Aetna Life Ins. Co., 723
S.W.2d 663, 665 (Tex. 1987). When construing a contract, including an insurance
policy, our primary focus is to ascertain the true intent of the parties as expressed in
the written document. Nat’l Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517,
520 (Tex. 1995). Whether a policy or contract is ambiguous is a question of law for
the court to determine. Id. A written contract that can be given a definite or certain
legal meaning is not ambiguous. Id. If the policy or contract contains no ambiguity,
the words used are to be given their ordinary meaning.  Puckett v. U.S. Fire Ins. Co.,
678 S.W.2d 936, 938 (Tex. 1984). If, however, the language of the policy or contract
is subject to two or more reasonable interpretations, the policy is ambiguous and the
construction that would afford coverage to the insured must be adopted. Nat’l Union,
907 S.W.2d at 520. A court should consider a contract, such as an insurance policy,
as a whole, giving effect to each part; no single phrase, sentence, or section of the
contract or policy should be isolated and considered apart from the other provisions. 
Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 133 (Tex. 1994). 
          The Policy 
          The issue on appeal is whether the Policy provides a single limit of liability of
$1,000,000 for the claims made against Drs. Doyan and Pearce in the Flax lawsuit,
as Columbia argues, or two separate limits of liability, of $1,000,000 each, for a total
of $2,000,000, for the claims made against Drs. Doyan and Pearce, as CPN and NES
argue. 
          The dispute over the limits of the Policy arises primarily from two Policy
provisions, Section III and Endorsement 12. Section III provides for the limits of
liability for each claim: 
The limit of liability stated for ‘each claim’ is the limit of
our liability for all injury or damage arising out of, or in
connection with, the same or related medical incident. 

This limit shall apply separately to: 
 
1. each individual specifically named in this policy who
qualify [sic] for coverage under the definition of you; and 
 
2. to the Partnership, Association or Corporation
specifically named as the named insured, collectively with
such personnel included as you by occupational
description, but not specifically named in this policy. 
 
This limit applies regardless of the number of persons
or organizations who are covered under this policy.

(Emphasis added.) “Claim” is defined as “the receipt by you of a demand for money
or services, naming you and alleging a medical incident.” “Claim” also “means a
medical incident which you report to us during the policy period which might result
in a claim.” The limit of liability for “each claim” is “the limit of our liability for all
injury or damage arising out of, or in connection with, the same or related medical
incident.” “Medical incident” is defined as “any act, error, or omission in the
providing of or failure to provide professional services by you.”
          Endorsement 12 of the Policy provides:
We agree with you,


 that the professional liability limits
shown on the policy Declarations page are amended to
include the following: 
 
                              $1,000,000 Per Loss Event (Indemnity & Expense) 
$3,000,000 Any One Person Policy Aggregate (Indemnity
and Expense)
 
The “Per Loss Event” limit applies to all Insureds for all
Damages to all persons for injuries to one patient. 

Endorsement 12 thus provides for a $1,000,000 Per Loss Event limit which applies
to “all Insureds for all Damages to all persons for injuries to one patient.” 
          “Loss Event”
          As appellees point out in their motion for en banc consideration, the term “Per
Loss Event” of Endorsement 12 is not defined in the Policy. Defining “per loss
event” in the context of a medical malpractice insurance policy appears to be a matter
of first impression for Texas. In insurance contracts generally, a “loss event” is the
event that gives rise to the insurance company’s liability under the contract. See
Helvering v. LeGierse, 312 U.S. 531, 539 (1941); AMERCO v. Subsidiaries v. C.I.R.,
96 T.C. 18, 38-39 (1991). Columbia, however, provided CPN and NES professional
liability insurance written on a claims-made basis. Under claims-made policies,
versus occurrence policies, “the mere fact that an insured loss-causing event occurs
during the policy period is not sufficient to trigger insurance coverage of the loss.” 
F.D.I.C. v. Mijalis, 15 F.3d 1314, 1330 (5th Cir. 1994). Rather, the insured generally
must give notice to the insurer of any claims asserted against the insured, as well as
of any occurrences that have caused or will potentially cause an insured loss. Id. The
basic distinction between claims-made and occurrence policies is that, while the
occurrence policy is triggered by the insured’s liability-producing conduct, the
claims-made policy is triggered by the presentation of a claim. Continental Cas. Co.
v. Maxwell, 799 S.W.2d 882, 886 (W.D. Mo. 1990). 
          Here, Columbia’s liability is triggered when a claim is made. Section III
defines a claim as the receipt of a demand for money or services that names the
insured and alleges a medical incident, and it limits Columbia’s liability for each
claim for injury “arising out of, or in connection with the same or related medical
incident.” When Section III and Endorsement 12 are read together, the $1,000,000
“per loss event” limit is Columbia’s limit of liability for each claim, which, Section
III provides, is “the limit of our liability for all injury or damage arising out of, or in
connection with, the same or related medical incident.”


 
          The “Loss Event” Limit
          Columbia interprets Endorsement 12 literally. It contends that the “per loss
event” limit of $1,000,000 “applies to all Insureds for all Damages to all persons for
injuries to one patient.” (Emphasis added.) Thus, because there is only one patient,
there is only one $1,000,000 limit for any “loss event,” i.e., for any damages “arising
out of, or in connection with, the same or related medical incident.”
          NES and CPN, on the other hand, ask us to interpret Endorsement 12 as
limiting Columbia’s $1,000,000 liability per loss event only with respect to all
persons asserting claims for injuries to one patient, i.e., with respect to derivative
claims, but not as limiting Columbia’s liability with respect to the insureds against
whom the claims are asserted, i.e., with respect to separate claims made against
separate physicians. Accordingly, NES and CPN argue that “Endorsement 12
operates to bring within the first Per Loss Event limit all claims the Flaxes asserted
against Doyan and within the second Per Loss Event limit all claims the Flaxes
asserted against Pearce.” 
          NES and CPN urge us to follow the reasoning in Tumlinson v. St. Paul
Insurance Company, 786 S.W.2d 406 (Tex. App.—Houston [1st Dist.] 1990, writ
denied), where we construed language of a policy that limited liability “for all claims
resulting from the injury . . . of any one person.” In Tumlinson, we held that only one
limit applied to separate claims filed by an injured child and its parents; thus, “the
insurance company’s liability is limited under the policy to $500,000 for the injury
of the child, regardless of the economic injury to the parents resulting from the child’s
injury.” Id. at 408. However, Tumlinson does not support NES’s and CPN’s position
because it addressed only derivative claims; therefore, it does not preclude our finding
that not only derivative claims, but also claims against different insureds with respect
to the same patient are subject to a single ‘per loss event’ limit of liability. 
          While we agree with NES and CPN that Endorsement 12 limits derivative
claims, we find that Endorsement 12 limits more than only derivative claims. 
Endorsement 12 is clear and unambiguous. Breaking down the sentence into its
logical parts, the per loss event limit applies to all insureds (NES, CPN, Dr. Doyan,
and Dr. Pearce) for all Damages (any damages sought in the Flax suit) to all persons
(Mrs. Flax and the Flax estate) for injuries to one patient (Flax). 
          Although a literal interpretation of Endorsement 12 seems to focus heavily on
the one patient aspect, it must be remembered that Endorsement 12 is limited by
Section III and its limit of liability for injury arising out of, or in connection with “the
same or related medical incident.” Therefore, if one doctor committed an act of
malpractice against a patient, and, six months later, the patient returned to the same
hospital where a second doctor committed a second, completely independent act of
malpractice on the same patient, there would not be one “loss event” despite there
being only one patient; because the two doctors did not cause an injury arising out
of, or in connection with, the “same or related medical incident,” (the second doctor’s
act was completely independent) the insurance company’s limit of liability would not
be limited, and there would be two per loss event limits. This is not the case here,
however, because, as will be discussed later, we find that the medical incidents
forming the basis of the Flax lawsuit are related medical incidents.
          NES’s and CPN’s interpretation of Endorsement 12 ignores the literal language
of the Endorsement and requires us to read “all persons” restrictively and “all
insureds” liberally, without any justification in the plain language of the Policy for
interpreting these phrases differently. Moreover, if Endorsement 12 served to limit
only derivative claims, as NES and CPN claim, there would be no limit as to any
underlying claim because, as NES and CPN acknowledge, the $1,000,000 figure,
limiting claims per loss event, is located in the Policy only in Endorsement 12. 
Furthermore, if we were to follow NES’s and CPN’s argument to its logical
conclusion, Columbia’s liability limits in the Policy would be meaningless. If, for
example, 15 doctors, over the course of a week, examined, misinterpreted,
mishandled, and miscommunicated the results of a patient’s x-rays, all in slightly
varying capacities, according to NES and CPN, 15 limits of liability in the amount of
$15,000,000 would be available under the Policy for the claims made against the 15
doctors. We do not believe this is the intended result of Endorsement 12. Rather, the
plain language of the policy limits the total recovery for “all injury or damage arising
out of , or in connection with, the same or related medical incident” to $1,000,000,
regardless of the number of insureds sued.
          Section III 
          Columbia argues that Section III of the Policy’s Professional Liability
Coverage offers further support for its interpretation of the Policy limits; NES and
CPN disagree. 
          Columbia contends that, under Section III, claims arising out of “related
medical incidents” are subject to a single limit of liability and, because the claims
made by the Flax plaintiffs against Drs. Doyan and Pearce are related medical
incidents, only one limit of liability applies. NES and CPN argue, in response, that
the medical incidents alleged against Drs. Doyan and Pearce in the Flax lawsuit as
separate claims are not related because the doctors’ actions were not causally related
to one another; therefore, they are separate claims and are subject to the “limit of
liability” stated for “each claim.” 
          The question of defining “related” in a medical malpractice insurance policy
appears to be one of first impression for Texas. The parties look to and provide
supporting authority from other jurisdictions. 
          NES and CPN, rely primarily


 on Arizona Property & Casualty Insurance
Guaranty Fund v. Helme, 735 P.2d 451 (Ariz. 1987), in which the Supreme Court of
Arizona construed the term “related” to apply to the question of whether a causal
relation existed between the acts or omissions of physicians treating patients. 735
P.2d at 455. While the Helme court recognized that “related,” in its commonly
accepted dictionary sense, means having a logical or causal connection, the court
nevertheless refused to apply this definition and noted, “We do not believe that the
word ‘related’ as used in the policy can be equated with the phrase ‘logical
connection.’ . . . Incidents may be ‘logically related’ for a wide variety of indefinable
reasons. Causal connection depends, to a much greater extent, on objective facts in
the record. ” Id. at 456. The Helme court, therefore, required a causal connection
between one physician’s negligence and the second physician’s negligence in order
to find related medical incidents. 
          Columbia relies heavily on Bay Cities Paving & Grading, Inc. v. Lawyers’
Mutual Insurance Co., 855 P.2d 1263 (Cal. 1993). In that case, the California
Supreme Court defined “related claims” as those encompassing “both logical and
causal connections,” noting that “restricting the word only to causal connections
improperly limits the word to less than its general meaning.” Id. at 1264; see also 
Paradigm Ins. Co. v. P& C Ins. Sys., Inc., 747 So.2d 1040, 1042 (Fla. Dist. Ct. App.
2000) (rejecting Helme, 735 P.2d at 451, and relying on Bay Cities in concluding that
failure to notify excess insurance carrier was logically “related” act for purposes of
notice provision of policy when both acts of negligence were said to have caused or
contributed to absence of insurance coverage for loss). The Policy itself does not
indicate that any particular definition, or a limited or restrictive definition, such as
NES and CPN suggest, should be used to replace the plain, ordinary, and generally
accepted meaning of “related.”


 See W. Reserve Life Ins. v. Meadows, 261 S.W.2d
554, 557 (Tex. 1953). Moreover, although a malpractice event may involve
numerous independent grounds of negligence that constitute a series of acts, Texas
law indicates that they can still be related and form a single malpractice claim. See
Am. Physicians Ins. Exch. v. Garcia, 876 S.W.2d 842, 853 n.21 (Tex. 1994)
(comparing definition and ramifications of “Each Claim Occurrence” in commercial
liability policy and medical malpractice policy; although “each claim occurrence” in
medical malpractice policy has coverage effect similar to continuous or repeated
exposure directive in commercial liability policy, malpractice event may involve
independent malpractice grounds that cannot be classified as repeated exposure to
same conditions but can constitute series of acts that are related). Thus, giving the
term “related” its ordinary and generally accepted meaning, we conclude that
“related” means having a logical or causal connection. See Merriam-Webster’s
Collegiate Dictionary 1050 (11th ed. 2003).
          Here, all the medical incidents involve the same patient, at the same facility,
during the same period of time, with regard to the same x-ray. All of the acts of
malpractice alleged against doctors Doyan and Pearce allegedly led to a single result
that formed the basis of the Flax lawsuit—failure to apprise Flax of his lymphoma,
leading to a delayed diagnosis and thus Flax’s early death from lymphoma. We hold,
therefore, that the medical incidents that form the basis of the Flax lawsuit are related
medical incidents under the plain meaning of the Policy language. 
          We sustain Columbia’s point of error. 
Conclusion 
          We hold that, as a matter of law, the plain language of the Policy at issue in this
case limits total recovery to $1,000,000 for each loss event encompassing the same
or related “medical incidents,” including all claims made by any and all persons
against any and all insureds in the Flax lawsuit. We reverse and render judgment that
Columbia’s total liability under the Policy is limited to $1,000,000. 
 
 





                                                             Evelyn V. Keyes
                                                             Justice
 
Panel consists of Justices Nuchia, Jennings, and Keyes.