IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

_____

EQUITY INCOME PARTNERS, LP, AN ARIZONA LIMITED PARTNERSHIP;
GALILEO CAPITAL PARTNERS LIMITED, A CAYMAN ISLANDS EXEMPTED
COMPANY,
*Plaintiffs/Appellants,*

*v.*

CHICAGO TITLE INSURANCE COMPANY, A DELAWARE CORPORATION,
*Defendant/Appellee.*

_____

No. CV-16-0162-CQ
Filed February 7, 2017

_____

United States District Court for the District of Arizona
No. 2:11-cv-01614-SMM

Certified Questions from the
United States Court of Appeals for the Ninth Circuit
*Equity Income Partners, LP v. Chi. Title Ins. Co.*, 828 F.3d 1040 (9th Cir. 2016)
**QUESTIONS ANSWERED**

_____

COUNSEL:

Dennis I. Wilenchik (argued), Tyler Q. Swensen, Wilenchik & Bartness,
P.C., Phoenix, Attorneys for Equity Income Partners, LP and Galileo Capital
Partners Limited

Daniel E. Fredenberg (argued), Fredenberg Beams, Phoenix, and Patrick J.
Davis, Nathaniel B. Rose, Fidelity National Law Group, Phoenix, Attorneys
for Chicago Title Insurance Company

Ari Ramras, Ramras Legal, PLC, Phoenix, Attorneys for Amicus Curiae
Land Title Association of Arizona

_____

JUDGE BARTON* authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE PELANDER, and JUSTICES BRUTINEL and BOLICK joined.

———————

JUDGE BARTON, opinion of the Court:

¶1      The United States Court of Appeals for the Ninth Circuit was recently asked to decide what impact, if any, a lender's full-credit bid made at an Arizona trustee's sale has on an insurer's liability under standard form title insurance policies. *See Equity Income Partners, LP v. Chi. Title Ins. Co.*, 828 F.3d 1040, 1040 (9th Cir. 2016) (mem.). The policy provisions at issue are Sections 2, 7 and 9, which are quoted in full below. Briefly, Section 2 provides that coverage continues in force when an insured acquires the property in a foreclosure sale, but the amount of coverage is reduced by all payments made. Section 9 provides that payments of principal or the voluntary satisfaction or release of the mortgage reduce available insurance coverage, except as provided under Section 2(a). Section 7 explains how the insurer's liability is calculated and refers to both Sections 2 and 9.

¶2      Resolution of the issue presented to the Ninth Circuit is governed by Arizona law and no Arizona appellate decision has addressed it. Therefore, the Ninth Circuit certified the following questions to this Court:

1.  When a lender purchases property by full-credit bid at a trustee's sale, does Section 9 apply, or does Section 2 apply?

2.  Is a full-credit bid at a trustee's sale a "payment" or "payment[ ] made" under sections 2 or 9 of the Policies?

3.  To what extent does a full-credit bid at a trustee's sale either (a) terminate coverage under section 2(a)(i) of

_____

* Justice Ann A. Scott Timmer has recused herself from this case. Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Janet Barton, Presiding Judge of the Superior Court of Maricopa County, was designated to sit in this matter.

the Policies, or (b) reduce coverage under Section 2 and any possible liability under section 7?

¶3        By Order dated August 1, 2016, we accepted jurisdiction.  *See* A.R.S. § 12-1861.  For the reasons set forth below, we answer the Certified Questions as follows:

1.        Section 2 applies when a lender purchases property by full-credit bid at a trustee's sale.

2.        A full-credit bid at a trustee's sale is not a "payment" under Sections 2 or 9 of the policy.

3.        The full-credit bid neither terminates nor reduces coverage under Section 2 or Section 7.[1]

## I. BACKGROUND

¶4        For purposes of answering the certified questions, the facts are undisputed.  In May 2006, appellants (hereinafter referred to as "Equity") issued two loans, each in the amount of $1,200,000 and each secured by a deed of trust.  The borrowers used the proceeds to purchase two adjacent lots (the "parcels").  In connection with that transaction, the predecessor in interest to appellee, Chicago Title Insurance Company ("CTIC"), issued to Equity two standard form title insurance policies (American Land Title Association Loan Policy (10-19-92) with ALTA Endorsement-Form 1 Coverage) (the "Policies").  These Policies, each in the amount of $1,200,000, insured Equity "against loss or damage, not exceeding the Amount of Insurance . . . sustained or incurred by [Equity] by reason of . . . [u]nmarketability of the title; [or] [l]ack of a right of access to and from the land . . . ."   Equity's borrowers obtained title insurance from Transnation Title Insurance Company ("Transnation").

---

[1] As explained below, the trustee sale may reduce or even eliminate a title insurer's ultimate liability under its policy.  However this reduction or elimination is not a function of the credit bid amount.  Rather, the amount of the reduction, if any, is the fair market value of the property the lender receives as a result of its credit bid or, if the property is acquired by a third party, the amount that party pays for the property.

**¶5**        In September 2006, Equity's borrowers discovered they could not legally access the parcels and, as a result, stopped making payments on their loans.  When Equity's borrowers informed Transnation of this defect, Transnation, in an attempt to cure the defect and obtain access to the parcels, sued Maricopa County, the owner of the land surrounding the parcels.  Equity, in turn, noticed trustee's sales to foreclose on the parcels.  When Transnation promised to make interest-only payments on behalf of the borrowers while its litigation against Maricopa County was pending, Equity agreed to halt the foreclosure process.

**¶6**        In March 2010, the court in Transnation's lawsuit ruled in favor of Maricopa County.  Shortly thereafter, Transnation stopped making interest payments under the loans which, in turn, caused Equity to re-notice the trustee's sales.  In January 2011, Equity acquired title to the parcels at the trustee's sales via full-credit bids totaling $2,620,725.18.

**¶7**        Equity subsequently submitted a claim to CTIC for the full amount of the Policies ($2,400,000 total).  When Equity and CTIC could not resolve the claim, Equity filed suit in Maricopa County Superior Court.  CTIC removed the case to the United States District Court for the District of Arizona.

**¶8**        The first issue presented to the district court was the appropriate date for measuring an insured lender's diminution-in-value loss under the title insurance policies.  In September 2012, the court ruled that the loss should be calculated as of the date the title policy was issued, rather than the date of foreclosure.  *See Equity Income Partners, LP v. Chi. Title Ins. Co.*, No. CV-11-1614-PHX-GMS, 2012 WL 3871505, at *5 (D. Ariz. Sept. 6, 2012); *cf. First Am. Title Ins. Co. v. Johnson Bank*, 239 Ariz. 348, 349 ¶ 14, 372 P.3d 292, 293 (2016) ("[W]hen an undisclosed title defect prevents the known, intended use of the property and causes the borrower to default on the loan, the lender's diminution-in-value loss should be calculated as of the date the title policy was issued rather than as of the date of foreclosure.").

**¶9**        The second issue presented to the district court was whether Equity's full-credit bids constituted actual payments of the principal of the underlying indebtedness, thereby extinguishing CTIC's liability under the Policies.  On this issue, the court ruled in CTIC's favor, finding that under Policy Section 9(b), Equity's full-credit bids constituted payments on the

principal of the indebtedness and, as such, reduced CTIC's liability pro tanto. *See Equity Income Partners, LP v. Chi. Title Ins. Co.*, No. CV-11-1614-PHX-SMM, 2013 WL 6498144, at *8–9 (D. Ariz. Dec. 11, 2013). Equity timely appealed the ruling on this issue to the Ninth Circuit which, in turn, certified the above-referenced questions to this Court.

## II. POLICY PROVISIONS

**¶10** Relevant here are Sections 2, 7, 9 and 10 of the Policies. Section 2, titled "Continuation of Insurance," provides:

> (a) After Acquisition of Title. The coverage of this policy shall continue in force as of Date of Policy in favor of (i) an insured who acquires all or any part of the estate or interest in the land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner which discharges the lien of the insured mortgage . . . .
> . . .
> (c) Amount of Insurance. The amount of insurance after the acquisition or after the conveyance shall in neither event exceed the least of:
> (i) the Amount of Insurance stated in Schedule A; [or]
> (ii) the amount of the principal of the indebtedness secured by the insured mortgage as of Date of Policy, interest thereon, expenses of foreclosure, amounts advanced pursuant to the insured mortgage to assure compliance with laws or to protect the lien of the insured mortgage prior to the time of acquisition of the estate or interest in the land and secured thereby and reasonable amounts expended to prevent deterioration of improvements but reduced by the amount of all payments made. . . .

Section 7, titled "Determination and Extent of Liability" provides:

> This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.
> (a) The liability of [CTIC] under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in Section 2(c) of these Conditions and Stipulations;

(ii) the amount of the unpaid principal indebtedness secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time the loss or damage insured against by this policy occurs, together with interest thereon; or

(iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(b)    In the event the Insured has acquired the estate or interest in the manner described in Section 2(a) of these Conditions and Stipulations or has conveyed the title, then the liability of [CTIC] shall continue as set forth in Section 7(a) of these Conditions and Stipulations.

Section 9, titled "Reduction of Insurance; Reduction or Termination of Liability" provides:

(a)    All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto. However, any payments made prior to the acquisition of title to the estate or interest as provided in Section 2(a) of these Conditions and Stipulations shall not reduce pro tanto the amount of the insurance afforded under this policy except to the extent that the payments reduce the amount of the indebtedness secured by the insured mortgage.

(b)    Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of insurance pro tanto. The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of

insurance be greater than the Amount of Insurance stated in Schedule A.

(c)     Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of [CTIC] except as provided in Section 2(a) of these Conditions and Stipulations.

Section 10, entitled "Liability Noncumulative" provides:

If the insured acquires title to the estate or interest in satisfaction of the indebtedness secured by the insured mortgage, or any part thereof, it is expressly understood that the amount of insurance under this policy shall be reduced by any amount [CTIC] may pay under any policy insuring a mortgage to which exception is taken in Schedule B [listing 2006 tax liens, water rights, items on a boundary survey, etc.] or to which the Insured has agreed, assumed or taken subject, or which is hereafter executed by an insured and which is a charge or lien on the estate or interest described or referred to in Schedule A [listing borrowers' mortgages], and the amount so paid shall be deemed a payment under this policy.

### III. DISCUSSION

#### A.  Question 1

¶11     We first consider whether, under Arizona law, Section 9 or Section 2 of the Policies applies when a lender acquires property by full-credit bid at a trustee's sale.  In answering this question we construe the Policies as a whole and read each section of the Policies in light of the others so as to give effect to all of the Policies' provisions.  *See Goodman v. Newzona Inv. Co.*, 101 Ariz. 470, 473, 421 P.2d 318, 321 (1966).

¶12     Section 2 directly addresses the consequences of such an acquisition, including its effect on both the existence and the amount of coverage under the Policies.  Indeed, Section 9 expressly defers to Section 2 when the property is acquired by the lender at a trustee's sale.  *See* Section 9(c).  In addition, as explained below, concluding that Section 9 applies in such circumstances would impermissibly render Section 2 meaningless. *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 536, 647 P.2d 1127, 1134

7

(1982) (an insurance policy "must be read as a whole in order to give a reasonable and harmonious meaning and effect to all its provisions") (quoting *Fed. Ins. Co. v. P.A.T. Homes, Inc.*, 113 Ariz. 136, 139, 547 P.2d 1050, 1053 (1976), *overruled in part on other grounds by State Farm Mut. Auto. Ins. Co. v. Wilson*, 162 Ariz. 251, 782 P.2d 727 (1989)). Thus, we hold that Section 2 of the Policies applies when a lender acquires property at a trustee sale by either a full- or partial-credit bid.

## B. Question 2

¶13        The second certified question is whether a full-credit bid at a trustee's sale constitutes a "payment" or "payment[ ] made" under either Section 2 or 9 of the Policies. The terms "payment" and "payment made" are not defined in the policy.[2] Absent a specific definition, terms in an insurance policy are construed "according to their plain and ordinary meaning," and the policy's "language should be examined from the viewpoint of one not trained in the law or in the insurance business." *Sparks*, 132 Ariz. at 534, 647 P.2d at 1132. If a term remains ambiguous after considering any underlying legislative policy, social goals, and the transaction as a whole, a court must construe it in favor of coverage, that is, against the insurer, given that the insurer is in the best position to prevent ambiguity in a standard form contract. *See First Am. Title Ins. Co. v. Action Acquisitions, LLC*, 218 Ariz. 394, 397 ¶ 8, 187 P.3d 1107, 1110 (2008).

¶14        "Payment" is ordinarily understood to mean "the act of paying or giving compensation" or "something given to discharge a debt or obligation to fulfill a promise." Webster's Third New Int'l Dictionary 1659 (2002). Pursuant to Arizona's statutory foreclosure scheme, a full-credit bid is deemed by operation of law to fully satisfy the borrower's outstanding obligation even though the lender makes and receives no monetary payment as a result of the transaction, other than paying the costs and expenses of the sale. *See* A.R.S. § 33-801(5); *Markham Contracting Co. v. Fed. Deposit Ins. Co.*, 240 Ariz. 360, 366 ¶ 26, 379 P.3d 257, 262 (App. 2016) (noting that lender, by making a full-credit bid, acquires the property

---

[2] Although "payment" is defined in Section 10 of the Policies, that definition is inapplicable here as it deals with amounts paid by CTIC. *See* Section 10 (certain amounts *CTIC* "may pay under the policy . . . shall be deemed a payment under this policy").

without having to actually pay for anything other than the costs and expenses of the sale). In reality, when a lender acquires property at a trustee's sale, the property is all the lender receives. Consequently, the lender is only made whole if the fair market value of the property acquired equals the amount still owed under the loan and the costs incurred by the lender in enforcing its deed of trust.

¶15        Under Arizona's statutory scheme for nonjudicial foreclosures, the satisfaction of the borrower's loan obligations by a credit bid may have the same effect as a "payment" from the borrower's perspective. That does not mean, however, that a credit bid has the same effect from the lender's perspective (that a lender is necessarily made whole by virtue of acquiring the property in foreclosure with a full-credit bid). Nor does the impact of a credit bid on the borrower under Arizona's foreclosure laws mean that a layperson would understand a credit bid to constitute a "payment" or "payment made" as those terms are used in title insurance policies. *See Bank of Idaho v. First Am. Title Ins. Co.*, 329 P.3d 1066, 1069 (Idaho 2014) (noting that, "the words 'payments made' [as used in section 9 of the standard form policy] would normally be construed by laymen to mean payments made by the obligor on the principal indebtedness secured by the deed of trust, not a credit bid made by a lender at a trustee's sale"). Thus, we conclude that the terms "payment" and "payment made" as used in the Policies do not include either a full- or partial-credit bid made by a lender pursuant to Arizona's statutory foreclosure scheme.

¶16        Our conclusion is also supported by our state's public policy. As between a borrower and a lender, Arizona requires a lender to assume the risk that the borrower will repay the loan and, if the borrower fails to do so, that the value of the security will be sufficient to cover any outstanding balance. If the value of the collateral is insufficient to cover the loan's outstanding balance, Arizona's foreclosure scheme protects the borrower and any other person directly, indirectly, or contingently liable under the loan, such as partners and guarantors, from deficiency judgments. *See, e.g.*, A.R.S. § 33-814 (barring deficiency judgments altogether for most residential properties and limiting the time frame for seeking such judgments for other properties as well as the amount that can be obtained); *see also M & I Bank, FSB v. Coughlin*, 805 F. Supp. 2d 858, 861 (D. Ariz. 2011). This protection is afforded not because the full-credit bid constitutes an actual "payment" and does, indeed, fully repay the lender

under the loan, but rather because Arizona's deed of trust framework embodies this state's long-recognized public policy of protecting debtors. *See CSA 13-101 Loop, LLC v. Loop 101, LLC*, 236 Ariz. 410, 412 ¶ 12, 341 P.3d 452, 454 (2014) ("The fair market value provision, as well as the deed of trust framework generally, accords with Arizona's long-recognized public policy of protecting debtors.").

¶17 In the insurer/insured context, however, Arizona's public policy protects insureds. Hence Arizona law requires that undefined terms be given the meaning used by laypeople in everyday usage and that terms and provisions that remain ambiguous after all relevant considerations be interpreted in favor of coverage and against the insurer. *See Action Acquisitions, LLC,* 218 Ariz. at 397 ¶ 8, 187 P.3d at 1110; *Sparks*, 132 Ariz. at 534, 647 P.2d at 1132.

¶18 Accepting CTIC's interpretation of "payment" and "payment made" as including a credit bid would contravene this public policy. If CTIC had wanted to limit its liability under the Policies by expanding the ordinary meaning of the terms "payment" and "payment made" to include full-credit bids, it should have written the Policies to so provide. *Roberts v. State Farm Fire & Cas. Co.*, 146 Ariz. 284, 286, 705 P.2d 1335, 1337 (1985) ("[I]f an insurer wishes to limit its liability, it must employ language in the policy which clearly and distinctly communicates to the insured the nature of the limitation.").

¶19 Adopting CTIC's interpretation of the terms "payment" and "payment made" as including full- or partial-credit bids would also render Section 2 of the Policies meaningless, an outcome to be avoided under the basic rules of contract interpretation. *See Goodman*, 101 Ariz. at 473, 421 P.2d at 321. As noted above, Section 9(b) provides that partial payment of the principal indebtedness reduces CTIC's liability pro tanto. Section 9(c) provides that payment in full of the underlying indebtedness terminates CTIC's liability. Section 2(c) provides that if the property is acquired by the insured in a trustee's sale, CTIC's liability is reduced by the amount of all payments made. If, as CTIC contends, a full- or partial-credit bid constitutes a "payment" or "payment made" as those terms are used in Sections 2 and 9 of the Policies, then Section 2 serves no purpose. The result that Section 2 dictates under CTIC's interpretation of the Policies (a pro tanto reduction of coverage for partial-credit bids and a termination of liability for full-credit bids) is also required by Section 9(b) and (c). In other

words, there would be no need for a separate provision discussing the effects on coverage of acquiring the property by trustee sale if, under Section 9, the term "payment" and "payment made" included credit bids. The only way to give effect to all of the Policies' provisions is to interpret the terms "payment" and "payment made" as used in Sections 2 and 9 as not including credit bids.

¶20        CTIC argues that the definition of full-credit bid found in A.R.S. § 33-801(5) is incorporated in the Policies because a valid statute is automatically part of any contract affected by it, even if the statute is not specifically mentioned in the contract. Although we agree that contracts are subject to applicable statutes, that principle does not advance CTIC's position here.

¶21        Section 33-801(5) does not state that a credit bid constitutes a "payment" or "payment made." Indeed, neither the term "payment" nor "payment made" is used in the statute. Rather "credit bid" is defined as:

> [A] bid made by the beneficiary in full or partial satisfaction of the contract or contracts which are secured by the trust deed. Such credit bid may only include an amount up to the full amount of the contract or contracts secured by the trust deed, less any amount owing on liens or encumbrances with interest which are superior in priority to the trust deed and which the beneficiary is obligated to pay under the contract or contracts or under the trust deed, together with the amount of other obligations provided in or secured by the trust deed and the costs and expenses of exercising the power of sale and the sale, including the trustee's fees and reasonable attorney fees actually incurred.

¶22        Arizona's statutory foreclosure scheme addresses the effects of foreclosure on the relationship between lenders and persons directly, indirectly, or contingently liable for the debt. *See* A.R.S. §§ 33-801 *et seq.* Title insurers, however, are not directly, indirectly, or contingently liable for the underlying indebtedness. Rather, as noted by CTIC itself in a letter it sent to Equity, title insurers *"indemnif[y] against actual loss compensable under the terms of the title insurance policy arising from a matter for which coverage is afforded."*

¶23      Policy provisions limiting the insurer's liability must be communicated clearly and distinctly -- not through the implied incorporation of a statute that does not define a credit bid as a "payment" or "payment made," does not pertain to title insurance policies, and governs relationships wholly separate and distinct from that of an insurer and insured. *See Roberts,* 146 Ariz. at 285–86, 705 P.2d at 1336–37. Therefore, we decline to construe § 33-801(5) as impliedly limiting a title insurer's liability more than is expressly provided by the policy terms themselves.

¶24      CTIC also cites various Arizona cases in support of its position that Equity's full-credit bid extinguished CTIC's liability under the Policies. These cases, however, all deal with claims against persons who were either indirectly or contingently liable under the loan or whose actions directly contributed to the lender's loss. *See, e.g., Coughlin*, 805 F. Supp. 2d at 867 ("The bank's full credit bid extinguished the borrower's debt and left the plaintiff with no loss to recover *from any third-party wrongdoer.*") (emphasis added); *333 W. Thomas Med. Bldg. Enters. v. Soetantyo*, 976 F. Supp. 1298, 1302–03 (D. Ariz 1995) (ruling that beneficiary could not maintain waste claim against defendants and had no damages by virtue of beneficiary's full-credit bid); *Nussbaumer v. Superior Court,* 107 Ariz. 504, 505–06, 489 P.2d 843, 844–45 (1971) (ruling that lender that acquired property via a full-credit bid could not subsequently collect from persons who, before foreclosure, had acquired part of lender's security under the loan agreement). Here, however, CTIC was not indirectly or contingently liable under the loan; nor were its actions in any way responsible for the defect in title that reduced the parcels' value and ultimately caused the borrowers to default.

## C. Question 3

¶25      The third question is to what extent a full-credit bid either (a) terminates coverage under Section 2(a)(i) of the Policies, or (b) reduces coverage under Section 2 and any possible liability under Section 7. Because the terms "payment" or "payment made" as used in the Policies do not include the amount of either a full- or partial-credit bid, we hold that such a bid does not terminate coverage under Section 2(a)(i) of the Policies or reduce coverage under Section 2 or any possible liability under Section 7.

¶26　　　　We recognize that the foreclosure process can terminate or reduce a title insurer's coverage or liability under its policy. Whether it does, however, is not a function of the credit bid. The "payment" the Lender receives on the indebtedness is the fair market value of the property it acquires as a result of the foreclosure. Although that amount in some cases may be the same as the credit bid, under Arizona law the latter does not establish fair market value. *MidFirst Bank v. Chase*, 230 Ariz. 366, 368 ¶ 7, 284 P.3d 877, 879 (App. 2012) (noting that a full- or partial-credit bid does not necessarily reflect the fair market value of the property and cannot be used as evidence of the property's fair market value as of the date of foreclosure). Although the parties here disagree as to the parcels' fair market value, treating that amount, whatever it may be, as a "payment" or "payment made" under the Policies assures that CTIC's liability is properly calculated and gives effect to all of the Policies' provisions.[3]

## IV. CONCLUSION

¶27　　　　For the foregoing reasons, we conclude that Section 2 applies when a lender acquires property via a full-credit bid at a trustee's sale. We further hold that the full-credit bid does not constitute "payment" or "payment made" under either Sections 2 or 9 of the Policies and, accordingly, the amount of the full-credit bid does not terminate coverage under Section 2(a)(i), reduce coverage under Section 2, or terminate or reduce liability under Section 7.

---

[3] When a credit bid is made, using the property's fair market value will actually benefit the insurer when that value exceeds the amount of the credit bid.