NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

AIMS INSURANCE PROGRAM MANAGERS INC.,
*Plaintiff/Appellant*,

*v.*

NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, et al.,
*Defendants/Appellees.*

No. 1 CA-CV 20-0032

FILED 02-04-2021

Appeal from the Superior Court in Maricopa County
No. CV2018-011295
The Honorable Christopher T. Whitten, Judge

**AFFIRMED IN PART; REMANDED IN PART**

COUNSEL

Galbut Beabeau PC, Scottsdale
By Olivier A. Beabeau, Grant H. Frazier
*Counsel for Plaintiff/Appellant*

Richards Law Office PC, Phoenix
By Charles F. Richards, Jr.
*Co-Counsel for Defendant/Appellee*

CNA Coverage Litigation Group, Oakland, CA
By Robert C. Christensen, admitted *pro hac vice*
*Co-Counsel for Defendant/Appellee*

---

**MEMORANDUM DECISION**

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Lawrence F. Winthrop and Chief Judge Peter B. Swann joined.

---

**C A M P B E L L**, Judge:

¶1 After thieves used a "spoofing" attack to defraud AIMS Insurance Program Managers, Inc. of more than $300,000, AIMS filed a claim with its insurer, National Fire Insurance Company of Hartford. National declined coverage under a forgery endorsement but paid $10,000, the policy per-occurrence limit, under an endorsement covering computer fraud. The superior court granted summary judgment to National, upholding the insurer's coverage decisions. For the following reasons, we affirm in part and remand in part for proceedings consistent with this decision.

**BACKGROUND**

¶2 Unknown third parties ("the thieves") secretly accessed an AIMS employee's email account in a scheme to fraudulently intercept payments from AIMS to its vendor, AmWINS Brokerage of Arizona ("AmWINS"). Having obtained counterfeit domain names nearly identical to the AmWINS domain name, the thieves created email accounts using the names of actual AmWINS employees and opened accounts at AmWINS' bank. The thieves then intercepted emails transmitting insurance binders and invoices from AmWINS to AIMS and replaced them with fraudulent emails, attaching the intercepted insurance binders and invoices that directed AIMS to wire payments to the thieves' accounts.

¶3 Upon receiving the seemingly legitimate but counterfeit emails, AIMS authorized three wire transfers, totaling $357,711.64, to the thieves in partial payment of three invoices. Twenty days after the initial breach of the employee's email account, AmWINS notified AIMS that it had not received payment on the invoices. AIMS immediately alerted both its bank and AmWINS' bank of suspected fraud but was able to recover less than a quarter of the wire-transferred funds.

¶4 AIMS submitted a claim to National under its business property insurance policy. National ultimately agreed to pay $10,000, the policy limit for a single occurrence, under the "Computer Fraud" endorsement to the policy but declined coverage under the "Forgery and Alteration Endorsement."

¶5 AIMS filed a complaint seeking a declaratory judgment that the policy covered its entire loss and alleging that National breached the parties' contract and acted in bad faith. With no factual issues in dispute, the parties stipulated to dismiss the claim for bad faith and cross-moved for summary judgment on the coverage claims. After oral argument, the superior court granted summary judgment in favor of National. The ruling was reduced to a final judgment and AIMS timely appealed.

## DISCUSSION

¶6 AIMS argues its loss from the spoofing falls within the policy's forgery endorsement and, in the alternative, that the fraudulently induced wire transfers constituted three separate occurrences under the policy's computer fraud endorsement.[1]

¶7 We review a superior court's summary judgment ruling de novo. *Tierra Ranchos Homeowners Ass'n v. Kitchukov,* 216 Ariz. 195, 199, ¶ 15 (App. 2007). We likewise review the interpretation of an insurance contract de novo. *Liberty Ins. Underwriters v. Weitz Co.*, 215 Ariz. 80, 83, ¶ 7 (App. 2007).

¶8 A court must read an insurance policy's provisions as a whole, interpreting each section "in light of the others so as to give effect to all" provisions. *Equity Income Partners v. Chicago Title Ins.*, 241 Ariz. 334, 338, ¶ 11 (2017). "Absent a specific definition, terms in an insurance policy are construed according to their plain and ordinary meaning, and [a] policy's language should be examined from the viewpoint of one not trained in the law or in the insurance business." *Id.* at ¶ 13 (internal quotations omitted). When a clause is "susceptible to different constructions," we will "attempt to discern the meaning of the clause" by examining its purpose, relevant public policy considerations, "and the transaction as a whole." *Keggi v. Northbrook Prop. and Cas. Ins.*, 199 Ariz. 43, 46, ¶ 11 (App. 2000) (internal

---

[1] "Spoofing" is a term used to describe "the practice of disguising a commercial e-mail to make the e-mail appear to come from an address from which it actually did not originate." *Medidata Sols., Inc. v. Fed. Ins.*, 268 F. Supp. 3d 471, 477 n.2 (S.D.N.Y. 2017) (citation omitted).

quotation omitted); *see also Equity Income Partners*, 241 Ariz. at 338, ¶ 13. If a term remains ambiguous after these analyses, we "must construe it in favor of coverage, that is, against the insurer, given that the insurer is in the best position to prevent ambiguity in a standard form contract." *Equity Income Partners*, 241 Ariz. at 338, ¶ 13. Finally, "the insured bears the burden to establish coverage under an insuring clause, and the insurer bears the burden to establish the applicability of any exclusion." *Keggi*, 199 Ariz. at 46, ¶ 13.

I.      **The Forgery Endorsement Does Not Cover the Fraudulently Induced Wire Transfers.**

**¶9**          The policy's forgery endorsement insures against "loss resulting directly from 'forgery' or alteration of, on, or in any check, draft, promissory note, bill of exchange, *or similar written promise, order or direction to pay a sum certain money, made or drawn by or drawn upon*" by AIMS or its agent (emphasis added). As defined in the policy, a "forgery" is "the signing of the name of another person or organization with intent to deceive."

**¶10**          The forgery endorsement expressly insures against forgeries of four specified categories of instruments ("check, draft, promissory note, bill of exchange"), each of which is independently negotiable. *See* A.R.S. § 47-3104(A)(1) (defining "negotiable instrument," as applicable here, as "an unconditional promise or order to pay a fixed amount of money" that is "payable to bearer or to order at the time it is issued"). Beyond the specified categories of instruments, the endorsement also covers loss from forgery of any other "similar written promise, order or direction to pay a sum certain money." AIMS argues this provision of the endorsement covers the invoices and demands for payment the thieves attached to the fraudulent emails because they are "*similar . . . order[s] or direction[s] to pay a sum certain money.*" *See Davis v. First Nat. Bank*, 26 Ariz. 621, 631 (1924) (holding that documents "growing out of the same transaction" must be "construed together as parts of a single agreement").

**¶11**          By its own terms, however, the forgery endorsement only insures against losses from forgeries of written promises, orders, or directions to pay a sum certain that are "similar," meaning *of the same nature* as checks, drafts, promissory notes, and bills of exchange, namely, negotiable instruments made or drawn by AIMS. But neither the emails nor the attached insurance binders and invoices were endorsable instruments payable upon tender in the same manner as negotiable instruments. *See* A.R.S. § 47-3104(A); *see also Statewide Ins. v. Dewar*, 143 Ariz. 553, 556 (1984)

(explaining an insurance binder "is simply a contract made in contemplation of the issuance of a later, formal agreement of insurance"). Taken together, the fraudulent emails and their attachments demanded payment by AIMS; they were not unconditional promises by AIMS to pay.

¶12        Finally, AIMS argues that the policy defines negotiable and nonnegotiable instruments together as "securities." But nothing in the forgery endorsement implicates the policy's definition of "securities." Moreover, had the parties intended to include nonnegotiable instruments in the forgery endorsement coverage, they would have done so.

## II.   The Fraud Constituted Three "Occurrences" under the Computer Fraud Endorsement.

¶13        As noted, the superior court held the policy's computer fraud endorsement covered the loss but ruled that the underlying events constituted just one "occurrence," thereby limiting AIMS' recovery to $10,000, the applicable per-occurrence limit under the policy. AIMS argues the superior court erred because the series of fraudulent emails constituted three separate occurrences.

¶14        As relevant here, the computer fraud endorsement insures against "loss . . . resulting directly from the use of any computer to fraudulently cause a transfer" from inside an AIMS' building or its bank to a person or place "outside those premises." The policy limits recovery under the endorsement to $10,000 "in any one occurrence," but does not define "occurrence" for purposes of the endorsement.

¶15        AIMS contends that each distinct "act of fraud," namely, each of the three counterfeit demands for payment that caused AIMS to execute a wire transfer, constituted a discrete "occurrence" of covered fraud under the endorsement. For its part, National contends there was just one occurrence under the policy because the cause of AIMS' loss was a single "fraudulent scheme."

¶16        "Ordinarily, if an insurance policy uses 'occurrence' without defining the term," the court must determine "whether there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damages." *Ariz. Prop. and Cas. Ins. Guar. Fund v. Helme*, 153 Ariz. 129, 134 (1987) (internal quotations omitted). Under that principle, "if a cause is interrupted or replaced by another cause, the chain of causation is broken and more than one occurrence has taken place." *Id.* (citing 8A J. Appleman, Insurance Law and Practice § 4891.25, at 16–19 (1981)).

**¶17** Applying those principles, we conclude the thieves' fraudulent actions resulted in three occurrences under the policy, not just one. Each email package represented a separate fraudulent payment demand, and each resulted in a separate wire transfer by AIMS, the victim of the fraud. In the language of the computer fraud endorsement, each of the three wire transfers "result[ed] directly from" a separate and distinct fraudulent payment demand by the thieves.

**¶18** National argues we should construe "occurrence" to include a "continuing condition," namely, the thieves' master scheme. As support, it cites *Cincinnati Indemnity Co. v. Southwestern Line Constructors Joint Apprenticeship and Training Program*, 244 Ariz. 546, 548, ¶ 6 (App. 2018), but the policy at issue in that case defined "occurrence" to include "continuous or repeated exposure to substantially the same general harmful conditions." The computer fraud endorsement in the policy National sold AIMS contains no such definition.

**¶19** National also cites *EOTT Energy Corp. v. Storebrand International Insurance,* 45 Cal. App. 4th 565 (Cal. Ct. App. 1996), and *Patterson v. American Economy Insurance*, 2016 WL 3213520 (E.D. Calif. June 9, 2016), but both cases are distinguishable. *EOTT* involved a "systematic" scheme to steal fuel from the insured by disabling the meters on the insured's fuel pumps. 45 Cal. App. 4th at 569–70. Although the thieves struck more than 650 times, causing the insured more than $1.5 million in losses, none of the individual instances resulted in a loss that exceeded the policy's $100,000 per-occurrence deductible. *Id*. at 570. As here, the policy did not define "occurrence," but it did specify that "*all claims* for loss, damage or expense arising out of any one occurrence . . . shall be adjusted as one claim." *Id.* at 575 (emphasis added). The court ruled for the insured, concluding that the term "occurrence" in the policy "reasonably contemplates that multiple claims could, in at least some circumstances, be treated as a single occurrence or loss." *Id.*; *see PECO Energy Co. v. Boden*, 64 F.3d 852, 857 (3d Cir. 1995) (ruling for the insured in a similar fuel-theft scheme, finding "the entire scheme of thefts constituted a single occurrence"). National, however, points to no language in the policy at issue suggesting that multiple "claims" were to be treated as a single occurrence.

**¶20** In *Patterson*, the insureds were merchants who stored their inventory offsite. 2016 WL 3213520 at 1. A thief broke in several times over a 12-day period and, altogether, drove off with truckloads of merchandise. *Id*. at 1–2. The per-occurrence limit of the policy was less than the insureds' loss, and the insureds argued the separate thefts constituted separate

occurrences. *Id*. at 1. The court ruled there was just one occurrence because all the thefts were part of the same scheme. *Id*. at 4, 7. The court likened "occurrence" to an "incident or event" and concluded it was more reasonable to conclude that the "incident or event" was the removal of the items, even over time, "by the same person (with or without help), without interruption from the proprietor or change in the circumstances of the property." *Id*. at 5.

¶21          In considering the series of acts here, rather than adopt the *Patterson* court's characterization of "occurrence" as an "incident or event," we apply the *Helme* standard and consider "whether there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damages." 153 Ariz. at 134 (internal quotation omitted). While each case National relies upon involved a string of thefts that occurred without interruption or involvement by the insured, here, the thieves sent separate counterfeit email packages to AIMS that induced the company to make three wire transfers in payment of three distinct invoices. Thus, the three fraudulent email packages were not "one proximate, uninterrupted, and continuing cause" that resulted in "all of the injuries and damages" that AIMS suffered. *See id.* Rather, each fraudulent demand for payment of one of the invoices was a distinct "causative act" that constituted a separate occurrence under the policy. *See id.* at 135.

¶22          This construction and application of the term "occurrence" in the policy is consistent with the rule that we give the terms of an insurance policy their plain and ordinary meaning. *Equity Income Partners*, 241 Ariz. at 338, ¶ 13. Moreover, even if the term "occurrence" is arguably ambiguous under the policy, we construe insurance contracts "in favor of coverage, that is, against the insurer, given that the insurer is in the best position to prevent ambiguity on a standard form contract." *Id.*

¶23          Accordingly, we hold that the circumstances here constitute three occurrences under the computer fraud endorsement of the policy, each of which entitles AIMS to recover the per-occurrence limit of $10,000.

**CONCLUSION**

¶24          For the foregoing reasons, we affirm the superior court's summary judgment except insofar as it concluded that the circumstances presented a single occurrence under the policy's computer fraud endorsement. We therefore remand for entry of a modified judgment consistent with this decision. Both parties request their attorneys' fees on appeal pursuant to A.R.S. § 12-341.01. In our discretion, we decline to award

attorneys' fees. We award AIMS its costs incurred on appeal, conditioned upon compliance with ARCAP 21.



AMY M. WOOD • Clerk of the Court
FILED:           HB